484 S.E.2d 627

**Calvin Arthur WOOD, Jr.**

v.

**COMMONWEALTH of Virginia.**

**No. 0605–96–2.**

Court of Appeals of Virginia,
Richmond.

May 6, 1997.

Rehearing En Banc Granted June 3, 1997.

656

John R. Maus, Louisa, for appellant.

Steven A. Witmer, Assistant Attorney General (James S. Gilmore, III, Attorney General, on brief), for appellee.

Present: BENTON and ANNUNZIATA, JJ., and COLE, Senior Judge.

ANNUNZIATA, Judge.

Appellant, Calvin Arthur Wood, Jr., was convicted of four offenses involving the possession of a firearm, cocaine and marijuana. On appeal, he contends the trial court erred in denying his motion to suppress. We disagree and affirm his convictions.

## I.

On the night in question, appellant's wife appeared at the Louisa County Sheriff's Office, her face bleeding from an injury she attributed to appellant. Two deputies, Hicks and Gholson, and a state trooper, Stanley, responded to appellant's residence to investigate. A few days earlier, appellant's teen-age stepson had been reported missing. When the officers responded to appellant's home, they believed that appellant's stepson remained missing.

Upon the officers' arrival, appellant invited them into his house. Appellant's two children, ages three and four, were asleep in the living room. Appellant and the officers did not discuss whether those children were the only other occupants of the house. The four men proceeded through the living room to the kitchen where, almost immediately thereafter, appellant was arrested. Hicks transported appellant to the sheriff's office; Gholson and Stanley remained to look after the children.

The sheriff's office contacted a social services representative, Solomon, who arrived at appellant's house within thirty to forty minutes. Meanwhile, Gholson and Stanley remained in the kitchen, periodically checking on the children asleep in the adjacent living room. After Solomon left appellant's home with the children, Gholson and Stanley looked through the remainder of the house, including the second floor, which they reached by opening a door located in a third room and ascending a flight of stairs.

Before entering appellant's house, Gholson and Stanley had noticed a light shining through a second floor window. Both officers believed that appellant had been on the first floor when they arrived, because he answered the door soon after they knocked. Neither officer heard any noise coming from the second floor, but Stanley stated he noticed a foul smell coming from somewhere. Gholson testified that they went upstairs "[t]o secure the residence, make sure there was nobody else there." Stanley likewise testified that he and Gholson "just wanted to check and make sure there was

nobody else, no kids or anything." Both Gholson and Stanley testified that they were specifically looking for appellant's missing stepson. Both also testified they had not thought to check the rest of the house until they were preparing to leave.

Once upstairs, the officers observed in plain view some of the evidence used to support appellant's convictions. At that time, the officers did not open any cabinets or containers; instead, they returned to the sheriff's office to obtain a search warrant. Back at the station, Gholson and Hicks were in the process of preparing an affidavit in support of a search warrant based on Gholson's observations when they were informed that appellant had consented to a further search of his house. Based on appellant's consent, Hicks returned to the house to oversee the search and seizure of additional evidence used to support appellant's convictions.

The trial court found that "the intrusion of the officers in the 2nd floor of the [appellant's] residence was justified as the officers were carrying out their duties as community caretakers." Accordingly, it denied appellant's motion to suppress.

## II.

The threshold and dispositive issue in this case is whether the officers faced circumstances sufficient to justify their entry into and search of the second floor of appellant's home.[1] Appellant does not dispute that if the entry was lawful, the evidence to support his convictions was properly seized and admitted into evidence. The Commonwealth concedes that if the entry was unlawful, all the seized evidence was tainted and inadmissible to support appellant's convictions.

■ "The ultimate standard set forth in the Fourth Amendment is reasonableness." *Cady v. Dombrowski*, 413 U.S. 433, 439, 93 S.Ct. 2523, 2527, 37 L.Ed.2d 706 (1973). Unreasonable searches and seizures are prohibited, but not those which are "reasonable in the circumstances." *Verez v. Commonwealth*,

---

1. We note there is no dispute that the officers' initial entry into appellant's home was lawful.

230 Va. 405, 410, 337 S.E.2d 749, 752 (1985), *cert. denied,* 479 U.S. 813, 107 S.Ct. 63, 93 L.Ed.2d 21 (1986). Warrantless entries and warrantless searches are presumed to be unreasonable, and the Commonwealth bears the burden to prove their justification. *E.g., id.; Commonwealth v. Ealy,* 12 Va. App. 744, 751, 407 S.E.2d 681, 686 (1991).

In the present case, the trial court found the officers' entry of the second floor of appellant's home justified under the community caretaker doctrine. *See Commonwealth v. Waters,* 20 Va.App. 285, 456 S.E.2d 527 (1995); *Barrett v. Commonwealth,* 18 Va.App. 773, 447 S.E.2d 243 (1994) (en banc), *rev'd on other grounds,* 250 Va. 243, 462 S.E.2d 109 (1995).[2] Pointing to the officers' knowledge of appellant's missing stepchild, the light shining through the second floor window, the unusual smell permeating the house, appellant's apparent beating of his wife, and the fact that the officers were the last to leave appellant's home, the Commonwealth argues that we should uphold the trial court's ruling. We agree.[3]

[Q]uite clearly police have occasion to enter premises without a warrant for a variety of . . . purposes. The police have "complex and multiple tasks to perform in addition to identifying and apprehending persons committing serious criminal offenses"; by design or default, the police are also expected to "reduce the opportunities for the commission of some crimes through preventive patrol and other measures," "aid individuals who are in danger of physical harm," "assist those who cannot care for themselves," "resolve

---

**2.** In reversing *Barrett,* the Supreme Court held that the evidence did not support a "reasonable suspicion" that Barrett was in need of police assistance. The Supreme Court did not rule on this Court's adoption of the community caretaker doctrine. 250 Va. at 247–48, 462 S.E.2d at 112.

**3.** The Commonwealth's contention that appellant's appeal is barred on procedural grounds for failure to brief or argue the community caretaker doctrine fails to consider that appellant argues the police had no basis to enter the second floor of his home and, specifically, that searching for the missing child was not a sufficient basis for the entry. Appellant clearly argues the basis of the trial court's decision, and we find no reason to bar his appeal on procedural grounds.

conflict," "create and maintain a feeling of security in the community," and "provide other services on an emergency basis."

3 W. LaFave, *Search and Seizure* § 6.6 at 389–90 (1996). The lawfulness of police action undertaken pursuant to such roles is sometimes evaluated in terms of the "community caretaking function," first discussed by the United States Supreme Court in *Cady v. Dombrowski,* 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973). *Cady* involved the warrantless search of an automobile.[4] First in *Barrett* and later in *Waters,* this Court relied on *Cady* and adopted the community caretaker doctrine to justify warrantless, investigative "seizures" of people for purposes of aiding a citizen reasonably believed to be in distress.

■ Under the facts of this case, we affirm the trial court's application of the community caretaker doctrine to justify the warrantless entry into and investigative search of the second floor of appellant's home. In so doing, we note that in the context of a warrantless entry and search, little, if any, distinction exists in Virginia law between the circumstances governing the application of the community caretaker doctrine and those governing the application of the "emergency" excep-

---

4. The *Cady* Court discussed well-established privacy distinctions between automobiles and residences in affirming the reasonableness of the search in that case. 413 U.S. at 439–42, 93 S.Ct. at 2527–29. Such distinctions, however, have not precluded courts from evaluating warrantless entry and search of premises under the community caretaker function, *see* LaFave, *supra,* at 390 n. 3, and while we recognize the distinction between the search of an automobile and the search of a home, we find that certain factors relevant to the *Cady* analysis provide guidance here. First, the *Cady* Court noted that the "police had exercised a form of custody or control over the [disabled automobile]" as a result of their investigating an automobile accident and the disabled driver's inability to make arrangements to have the automobile towed and stored. 413 U.S. at 442–43, 93 S.Ct. at 2528–29. Second, the Court noted that the police had the car towed to a private garage where, to protect the public, the trunk was searched in accordance with police procedure to assure the removal of a revolver the police believed to be there. *Id.* at 443, 93 S.Ct. at 2529. Finally, the Court noted that in conducting the "search," the police were not motivated by a desire to find incriminating evidence of possible criminal behavior. *Id.*

tion to the warrant requirement. *Compare Waters,* 20 Va. App. at 288–91, 456 S.E.2d at 529–30, *and Barrett,* 18 Va.App. at 776–79, 447 S.E.2d at 245–46, *with Reynolds v. Commonwealth,* 9 Va.App. 430, 436–37, 388 S.E.2d 659, 662–64 (1990), *and Shannon v. Commonwealth,* 18 Va.App. 31, 34–35, 441 S.E.2d 225, 226–27, *aff'd on reh'g,* 19 Va.App. 145, 449 S.E.2d 584 (1994). We have defined the community caretaker function of the police to be that duty which "extends beyond the detection and prevention of crime, to embrace also an obligation to maintain order and to render needed assistance." *Barrett,* 18 Va.App. at 777, 447 S.E.2d at 245. The community caretaker doctrine, like the emergency exception to the warrant requirement, is grounded in consideration of the fact that

police [officers] owe "duties to the public, such as rendering aid to individuals in danger of physical harm, reducing the commission of crimes through patrol and other preventive measures, and providing services on an emergency basis."

*Barrett,* 18 Va.App. at 778, 447 S.E.2d at 246 (quoting *Reynolds,* 9 Va.App. at 436, 388 S.E.2d at 663 (citation omitted)). *See also Waters,* 20 Va.App. at 289, 456 S.E.2d at 529; *Shannon,* 18 Va.App. at 34, 441 S.E.2d at 227. "[T]he duty of the police embraces the function of maintaining public order and providing necessary assistance to persons in need or distress." *Barrett,* 18 Va.App. at 778, 447 S.E.2d at 246.

■■■■ Applying the community caretaker doctrine, we find that the officers' entry into the second floor of appellant's home was lawful.

The appropriateness of applying the community caretaker doctrine to a given factual scenario is determined by whether: (1) the officer's initial contact or investigation is reasonable; (2) the intrusion is limited; and (3) the officer is not investigating criminal conduct under the pretext of exercising his community caretaker function.

*Waters,* 20 Va.App. at 290, 456 S.E.2d at 530. An officer may take appropriate action under the community caretaker doctrine where the officer maintains a reasonable and articulable suspicion, based on objective facts, that such action is neces-

sary. *See Barrett,* 18 Va.App. at 778, 447 S.E.2d at 246. "Objective reasonableness remains the linchpin of determining the validity of [such] action. . . ." *Waters,* 20 Va.App. at 290, 456 S.E.2d at 530. *Cf. Reynolds,* 9 Va.App. at 437, 388 S.E.2d at 663–64 (applying objective reasonableness test to emergency exception to warrant requirement).

■ Determination of whether the officers had reasonable suspicion to exercise their community caretaker function involves a mixed question of law and fact. The trial court's findings of historical fact will be upheld absent clear and manifest error. *See Reynolds,* 9 Va.App. at 437, 388 S.E.2d at 664. We review *de novo* the trial court's application of those facts to the legal standard of "reasonable suspicion." *See Ornelas v. United States,* —— U.S. ——, ——, 116 S.Ct. 1657, 1662, 134 L.Ed.2d 911 (1996). That standard is determined from the perspective of the objectively reasonable police officer, and we give deference to the inferences the police officer draws from the historical facts with which he or she is faced. *Id.* at ——, 116 S.Ct. at 1663; *Murphy v. Commonwealth,* 9 Va.App. 139, 144, 384 S.E.2d 125, 128 (1989) ("[W]hen a court reviews whether an officer had reasonable suspicion . . . it must view the totality of the circumstances and view those facts objectively through the eyes of a reasonable police officer with the knowledge, training, and experience of the investigating officer.").

■ In the present case, we find that the officers had a reasonable basis to justify the exercise of their community caretaker function, which led them to enter the second floor of appellant's home.[5] When the officers responded to appellant's house, they had reason to believe that appellant recently had

---

5. Appellant argues, and the Commonwealth agrees, that the officers' action in this case is not justifiable as a search incident to appellant's arrest. Our decision should not be construed as an extension of that doctrine. *See Maryland v. Buie,* 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990) (beyond spaces immediately adjoining place of arrest, officers may make a "protective sweep" of the premises upon reasonable suspicion that the area swept harbors an individual posing a threat to the officers).

beaten his wife and that appellant's stepson was missing. Upon their arrival, the officers noticed a light shining through a second floor window and determined that appellant was not on the second floor of the house when they arrived. One of the officers noticed a foul odor coming from somewhere in the house. Although neither officer heard any noise coming from the second floor, that alone would not preclude the presence of someone on that floor, and neither officer could be certain whether anyone else was in the house. The officers were assigned the duty to assure the safety and welfare of appellant's two younger children asleep in the living room of the house, and they were the last to leave the premises. Before leaving, the officers investigated the remaining rooms of the house to make certain that appellant's missing stepson was not there and to avoid leaving anyone else behind or the house unsecured. Because the officers were guided by their concern for the child they believed to be missing, their investigation was limited to those places where they could reasonably expect to find a person; they did not open any cabinets or containers. And, the record is devoid of evidence that the officers' entry of the second floor was a pretext for the investigation of criminal conduct.

■ Lawfully present on the second floor, the officers discovered certain items in plain view, the incriminating nature of which was immediately apparent to them. Accordingly, the plain view rule was met, and the items were subject to seizure and admissible in evidence. *See Reynolds,* 9 Va.App. at 439, 388 S.E.2d at 665; *Waters,* 20 Va.App. at 291, 456 S.E.2d at 530.

Accordingly, appellant's convictions are affirmed.

*Affirmed.*

BENTON, Judge, dissenting.

Because I believe that the warrantless entry by the police into the second floor of Wood's residence was not justified by any "community caretaking" function, I would reverse the decision of the trial judge denying the motion to suppress. Therefore, I dissent.

## I.

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ." U.S. Const. amend. IV. "The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home. . . ." *Payton v. New York,* 445 U.S. 573, 589, 100 S.Ct. 1371, 1381–82, 63 L.Ed.2d 639 (1980). Well settled is the " 'basic principle of Fourth Amendment law' that searches . . . inside a home without a warrant are presumptively unreasonable." *Id.* at 586, 100 S.Ct. at 1380 (citation omitted).

Noting that the United States Supreme Court, in *Cady v. Dombrowski,* 413 U.S. 433, 439–42, 93 S.Ct. 2523, 2527–29, 37 L.Ed.2d 706 (1973), "discussed well-established privacy distinctions between automobiles and residences in affirming the reasonableness of the [automobile] search in that case," the majority nevertheless ignores these distinctions. In *Cady,* the Supreme Court stated:

> Because of the extensive regulation of motor vehicles and traffic, and also because of the frequency with which a vehicle can become disabled or involved in an accident on public highways, the extent of police-citizen contact involving automobiles will be substantially greater than police-citizen contact in a home or office. Some such contacts will occur because the officer may believe the operator has violated a criminal statute, but many more will not be of that nature. Local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.
>
> . . . The constitutional difference between searches of and seizures from houses and similar structures and from vehi-

cles stems both from the ambulatory character of the latter and from the fact that extensive, and often noncriminal contact with automobiles will bring local officials in "plain view" of evidence, fruits, or instrumentalities of a crime, or contraband.

*Id.* at 441–42, 93 S.Ct. at 2528.

The Supreme Court's emphasis on the distinction between vehicle searches and searches of an individual's home strongly implies that the community caretaking function used to uphold the vehicle search in *Cady* would not justify an intrusion into an individual's home. This inference was verified when the Court later stated, in *South Dakota v. Opperman,* 428 U.S. 364, 367, 96 S.Ct. 3092, 3096, 49 L.Ed.2d 1000 (1976), the following:

> This Court has traditionally drawn a distinction between automobiles and homes or offices in relation to the Fourth Amendment. Although automobiles are "effects" and thus within the reach of the Fourth Amendment, *Cady v. Dombrowski,* 413 U.S. 433, 439 [93 S.Ct. 2523, 2527, 37 L.Ed.2d 706] (1973), warrantless examinations of automobiles have been upheld in circumstances in which a search of a home or office would not. *Cardwell v. Lewis,* 417 U.S. 583, 589 [94 S.Ct. 2464, 2468–2469, 41 L.Ed.2d 325] (1974); *Cady v. Dombrowski, supra,* at 439–440 [93 S.Ct. at 2527–2528]; *Chambers v. Maroney,* 399 U.S. 42, 48 [90 S.Ct. 1975, 1979–1980, 26 L.Ed.2d 419] (1970).

By citing *Cady* as an example of a search that would not have been upheld if it had involved an intrusion into an individual's home, I believe the Court made clear that the community caretaker doctrine cannot be used to justify a warrantless intrusion into a home. Accordingly, I would hold that the trial judge erred in holding that the warrantless entry into the second floor of Wood's residence was justified by the community caretaker doctrine.[6]

---

6. I believe that the Supreme Court has also circumscribed searches under the community caretaker doctrine by requiring the search to be

## II.

Assuming *arguendo* that the community caretaking doctrine may under appropriate circumstances justify warrantless searches of residences, I disagree with the majority's assertion that the search of the second floor of Wood's home was a valid exercise of that function. In *Cady*, the Supreme Court described "community caretaking functions" as being "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *See Cady*, 413 U.S. at 441, 93 S.Ct. at 2528. The evidence in this case proves that the search was not "totally divorced from" a criminal investigation.

The undisputed evidence proved that, on the night of the search, Wood's wife went to the police station and reported that Wood had assaulted her. The police promptly went to Wood's residence to investigate the alleged assault. When the police arrived, they entered Wood's house to discuss the assault, arrested Wood, and took Wood to the police station. Two officers remained at the house to wait for a social worker to take custody of Wood's children. After the social worker left with the children, the officers searched the second floor attic.

Because the search was a direct result of Wood's arrest, the search was not "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Id.* The officers entered the residence to conduct a criminal investigation and were still so employed when they began the search.

---

based upon a police department's "standard procedure" designed to protect the public and the police from danger. *Cady*, 413 U.S. at 443, 93 S.Ct. at 2529; *accord Opperman*, 428 U.S. at 369, 374–75, 96 S.Ct. at 3097, 3099–3100. Indeed, the Supreme Court of Virginia has noted that *Cady* and *Opperman* "involved the admissibility of incriminating evidence discovered during a standard police procedure of inventorying property that had properly been taken into custody." *Barrett v. Commonwealth*, 250 Va. 243, 247, 462 S.E.2d 109, 111 (1995). None of those factors exists in this case.

The majority suggests that the police officers went upstairs to search for a missing teenager. Although the officers testified that they knew Wood's wife's teenage son had been reported missing and that they were searching for the missing juvenile, the evidence belies that assertion. Officer Gholson testified that the Wood family had reported missing a juvenile *"that lived at [Wood's] residence."* Nevertheless, the officers stated that they were searching *Wood's* residence for the missing juvenile. The explanation that they were searching for a missing child at that child's own residence is dubious at best. The evidence also proved that after the officers arrested Wood and removed him from the residence at approximately midnight, the two officers who remained behind called a social worker. Two children were sleeping in the living room. While the two officers waited in the residence for the social worker to arrive, they did not look for the teenager. Only after the social worker left with the other children did they begin their search. The delay in conducting the search casts additional doubt on the officers' assertion that they were merely looking for the juvenile. Moreover, even if they were searching the house to find a teenager who had been reported missing by the parents who resided in the house, the officers obviously were conducting a criminal investigation.

I disagree with the suggestion that the police officers were permitted to enter rooms of the house to avoid leaving anyone behind or to assure that the house was secure. The officers stated that the search was instigated, in part, by the fact that they saw a light on upstairs. The police were not privileged to explore other rooms in the residence merely because they saw a light on in a residence at night. They did not inquire of Wood or his wife about whether other people were in the residence and did not call aloud while in the residence to ascertain whether anyone else was present. They heard no noise to suggest another person was there. Moreover, if they truly were concerned about securing the residence, they would not have left the door to the residence unlocked, as they did, when they left the residence.

Because the evidence indicates that the search for the child was "a pretext concealing an investigatory police motive," *Opperman,* 428 U.S. at 376, 96 S.Ct. at 3100, I would hold that the search was not a valid exercise of the community caretaking function.

For these reasons, I would hold that the trial judge erred in using the community caretaking function to admit the evidence and I would further hold that the evidence should have been suppressed. Accordingly, I dissent.

### UPON A PETITION FOR REHEARING EN BANC BEFORE THE FULL COURT

On May 12, 1997 came Calvin Arthur Wood, by court-appointed counsel, and filed a petition praying that the Court set aside the judgment rendered herein on May 6, 1997, and grant a rehearing en banc thereof.

On consideration whereof, the petition for rehearing en banc is granted, the mandate entered herein on May 6, 1997 is stayed pending the decision of the Court en banc, and the appeal is reinstated on the docket of this Court.

The parties shall file briefs in compliance with Rule 5A:35. It is further ordered that the appellant shall file with the clerk of this Court ten additional copies of the appendix previously filed in this case.