COURT OF APPEALS OF VIRGINIA

Present: Chief Judge Fitzpatrick, Judges Baker, Benton, Coleman,
         Willis, Elder, Annunziata and Overton
Argued at Richmond, Virginia


CALVIN ARTHUR WOOD, JR.
                                        OPINION BY
v.  Record No. 0605-96-2          JUDGE JAMES W. BENTON, JR.
                                       MARCH 31, 1998
COMMONWEALTH OF VIRGINIA


                   UPON A REHEARING EN BANC

          FROM THE CIRCUIT COURT OF LOUISA COUNTY
                    Jay T. Swett, Judge

          John R. Maus for appellant.

          Steven A. Witmer, Assistant Attorney General
          (Richard Cullen, Attorney General, on brief),
          for appellee.



     A trial judge convicted Calvin Arthur Wood, Jr. of four

offenses involving the possession of cocaine, marijuana, and a

firearm.  On appeal, Wood contends the trial judge erred using

the "community caretaker" exception to the warrant requirement as

a basis to deny his motion to suppress evidence.  A panel of this

Court, with one judge dissenting, affirmed the trial judge's

decision.  See Wood v. Commonwealth, 24 Va. App. 654, 484 S.E.2d

627 (1997).  Upon rehearing en banc, we reverse the trial judge's

decision denying the motion to suppress.

                              I.

     On the night of October 23, 1993, Wood's wife appeared at

the Louisa County Sheriff's Office with visible signs of injury

to her head and face.  She told officers she had been assaulted

by Wood at their residence.  When Officer Gholson, Deputy Hicks, and State Trooper Stanley arrived at Wood's residence, Gholson advised Wood that they were investigating Wood's wife's complaint that Wood assaulted her.  Wood admitted the officers into the residence and led them through the living room into the kitchen. After a brief discussion, Gholson arrested Wood, frisked him, and handcuffed him.  Gholson also removed Wood's house keys from his pocket and placed them in a kitchen drawer.

Wood's two children, ages three and four, were asleep in the living room.  Wood and the officers did not discuss whether those children were the only other occupants of the house.  Although the record indicates that Wood's teenage stepson had been reported missing a few days earlier, that fact was not raised by either the officers or Wood.  Deputy Hicks transported Wood to the sheriff's office.

Gholson and Stanley remained with the sleeping children while the sheriff's office contacted a social services representative to come for the sleeping children.  Gholson testified that he and Stanley remained in the kitchen as the children slept in the adjacent living room.  Gholson also testified that he did not hear any noises or any activity from upstairs during the time he was at the house.  Stanley testified that he smelled a foul odor, which he could not identify.

The social services representative arrived at the residence within thirty to forty minutes and took the children.  Gholson

and Stanley then looked throughout the house, including the second floor. They entered the second floor by opening a door in a room on the first floor and ascending a flight of stairs. Gholson stated that his purpose in going upstairs was "[t]o secure the residence, make sure there was nobody else there." He further testified that he "had prior knowledge of a missing juvenile report on file with the sheriff's office" and that he saw a light upstairs. Stanley testified that they "wanted to make sure there was nobody else, no kids or anything."

In plain view, in the upstairs bedroom, Gholson and Stanley found marijuana, drug paraphernalia, and a firearm. The officers testified that they did not open any cabinets or containers at that time. Instead, they returned to the sheriff's office to obtain a search warrant. They did not lock the door to the residence when they left to obtain the search warrant.

At the sheriff's office, Wood twice refused to give Hicks consent to search his residence. After Wood first refused, Gholson, who had then returned from Wood's residence, told Hicks to ask again. Two to four hours after Wood's arrival at the sheriff's office, Wood told the officers they could search his residence. When Wood consented to a further search, Hicks and Gholson, who were in the process of preparing an affidavit in support of a search warrant based on Gholson's observations, ceased their efforts to obtain a search warrant. They returned to Wood's residence and assisted in the additional search and

- 3 -

seizure of evidence used to support Wood's convictions.

Wood filed a motion to suppress the evidence found in his residence. After hearing evidence and reviewing the briefs of counsel, the trial judge ruled that "the intrusion of the officers in the [second] floor of [Wood's] residence was justified as the officers were carrying out their duties as community caretakers, and that after being lawfully in the area in which [Wood] had an expectation of privacy, the officers were entitled to seize what was in plain view." Accordingly, the judge denied Wood's motion to suppress.

## II.

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. By its explicit terms, "[t]he Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home." Payton v. New York, 445 U.S. 573, 589 (1980). Well settled is the "'basic principle of Fourth Amendment law' that searches . . . inside a home without a warrant are presumptively unreasonable." Id. at 586 (citation omitted).

The Supreme Court of the United States first addressed the "community caretaker doctrine" in Cady v. Dombroski, 413 U.S. 433 (1973). In affirming the reasonableness of the search in that

- 4 -

case, the Court discussed well-established privacy distinctions between motor vehicles and residences.

> Because of the extensive regulation of motor vehicles and traffic, and also because of the frequency with which a vehicle can become disabled or involved in an accident on public highways, the extent of police-citizen contact involving automobiles will be substantially greater than police-citizen contact in a home or office. Some such contacts will occur because the officer may believe the operator has violated a criminal statute, but many more will not be of that nature. Local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.
>
> The constitutional difference between searches of and seizures from houses and similar structures and from vehicles stems both from the ambulatory character of the latter and from the fact that extensive, and often noncriminal contact with automobiles will bring local officials in "plain view" of evidence, fruits, or instrumentalities of a crime, or contraband.

Id. at 441-42.

The Supreme Court's emphasis on the distinction between motor vehicle searches and searches of an individual's home makes clear that the community caretaking function used to uphold a vehicle search, such as existed in Cady, may not be sufficient to justify an intrusion into an individual's home. The fact that circumstances which justify a warrantless search in an automobile may not justify an intrusion into a home or office under the

- 5 -

community caretaking function was reiterated in <u>South Dakota v. Opperman</u>, 428 U.S. 364, 367 (1976), when the Court stated the following:

> This Court has traditionally drawn a distinction between automobiles and homes or offices in relation to the Fourth Amendment. Although automobiles are "effects" and thus within the reach of the Fourth Amendment, <u>Cady v. Dombrowski</u>, 413 U.S. 433, 439 (1973), warrantless examinations of automobiles have been upheld in circumstances in which a search of a home or office would not. <u>Cardwell v. Lewis</u>, 417 U.S. 583, 589 (1974); <u>Cady v. Dombrowski</u>, <u>supra</u>, at 439-440; <u>Chambers v. Maroney</u>, 399 U.S. 42, 48 (1970).

Thus, the Supreme Court has yet to decide whether a situation might exist that would justify a warrantless intrusion into an individual's home under the "community caretaker" doctrine, as distinguished from an emergency or exigent circumstances. The Supreme Court has not decided that issue, and we need not decide it here because, on these facts, the officers' intrusion into the room on the second floor of the home was not totally divorced from investigating criminal activity and acquiring evidence and, therefore, could not be considered a caretaking function.

In <u>Cady</u>, the Supreme Court described "community caretaking functions" as being "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." 413 U.S. at 441. The undisputed evidence in this record proved that the officers went to Wood's residence to investigate the report that Wood assaulted his wife. When the police arrived, they entered Wood's house to

discuss the assault, arrested Wood "almost immediately" in the kitchen, and took Wood to the police station.  After the social worker left with the children, the officers searched the second floor living area.  Because the search was a direct result of Wood's arrest, the search was not "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute."  Id.  The officers entered the residence to conduct a criminal investigation and were still so employed when they began the search.

We, therefore, hold that the warrantless entry by the officers into the second floor of Wood's residence was not justified by any "community caretaker" function.  The "community caretaker" exception to the warrant requirement is a narrowly construed exception to the Fourth Amendment warrant requirement.  Nothing in this record supports an extension of its application to a warrantless intrusion into Wood's upstairs bedroom under the circumstances proved in this record.

The Commonwealth suggests that the police officers went upstairs to search for a missing teenager.  Although the officers testified that they knew Wood's teenage stepson had been reported missing and that they entered the second floor to search for the missing teenager, the evidence belies that assertion.  Officer Gholson testified that the Wood family earlier had reported missing the teenager "that lived at [Wood's] residence."  Nevertheless, the officers stated that they were searching Wood's

residence for the missing teenager.  The explanation that the officers were searching for a missing child at that child's own residence is dubious at best.

The evidence also proved that after the officers arrested Wood and removed him from the residence at midnight, the two officers remained behind because two children were sleeping in the living room.  While the two officers waited in the residence for the social worker to arrive, they did not look for the teenager.  Only after the social worker left with the other children did they begin their search.  The delay in conducting the search casts additional doubt on the officers' assertion that they were merely looking for the teenager.  Moreover, even if they were searching the house to find a teenager who had been reported missing by the parents who resided in the house, the officers obviously were then conducting a criminal investigation.  Simply put, the evidence in this case proves that the search was not "totally divorced from" a criminal investigation.

The officers also stated that the search was instigated, in part, by the fact that they saw a light upstairs.  The officers were not privileged to explore other rooms in the residence merely because they saw a light on in a residence at night.  They did not inquire of Wood or his wife whether other people were in the residence, they heard no noise to suggest another person was present, and they did not call aloud while in the residence to ascertain whether anyone else was present.  Moreover, the

officers' stated concern about securing the residence was belied by the fact that they left the residence unlocked when they went to apply for a search warrant. Gholson removed the keys from Wood and could have used them to lock the residence. Because the evidence indicates that the search was "a pretext concealing an investigatory police motive," Opperman, 428 U.S. at 376, the search cannot be deemed a valid exercise of the community caretaking function.

### III.

After upholding the officers' "community caretaking" search, the trial judge found that Wood "freely and voluntarily" consented to a further search. That finding was made, however, within the context of the trial judge's ruling that the officers lawfully entered the room upstairs where they saw the marijuana and drug paraphernalia. Because we hold that the entry into the room upstairs was not a lawful search, we must consider whether Wood's consent to the second search of his residence "purged the taint" of the initial unlawful search.

If Wood's consent was obtained as a product of the illegal search, it was invalid as a "fruit of the poisonous tree," see Walls v. Commonwealth, 2 Va. App. 639, 651, 347 S.E.2d 175, 182 (1986), unless the Commonwealth can show that the consent was "sufficiently an act of free will to purge the primary taint of the illegal [search]." Wong Sun v. United States, 371 U.S. 471, 486 (1963). Although the trial judge found that Wood's consent

to the second search was given "freely and voluntarily," the principle is well established that "[t]he fact that the consent was voluntary . . . does not mean that it was 'sufficiently an act of free will to purge the primary taint.'"  Walls, 2 Va. App. at 654, 347 S.E.2d at 183 (citations omitted).  In determining whether a consent was "sufficiently attenuated from the [illegal search] to purge its taint," this Court has "considered, in addition to the voluntariness of the consent, the temporal proximity and the presence of intervening circumstances between the [illegality] and the consent, [the defendant's] awareness of a right to withhold consent, and the purpose and flagrancy of the police misconduct."  Commonwealth v. Ealy, 12 Va. App. 744, 755, 407 S.E.2d 681, 688 (1991).  See Walls, 2 Va. App. at 653, 347 S.E.2d at 183.

The circumstances surrounding the initial search of Wood's residence and the later request for Wood's consent to search manifestly demonstrate that "the evidence obtained pursuant to [Wood's] voluntary consent to search was '"come at by exploitation of [the initial] illegality" rather than "by means sufficiently distinguishable to be purged of the primary taint."'"  Ealy, 12 Va. App. at 757, 407 S.E.2d at 689 (quoting Wong Sun, 371 U.S. at 488 (citation omitted)).  The officers did not seek Wood's consent until after they had made their illegal foray into the upstairs of Wood's residence and found incriminating evidence.  They sought Wood's consent to further

search the residence for other incriminating evidence that might have been hidden from view.  The evidence suggests no basis to believe the officers would have attempted to secure a search warrant or to gain Wood's consent had they not initially unlawfully discovered the incriminating evidence.  "Upon this record, the officers clearly would not have sought [Wood's] consent if they had not seen the [drugs and paraphernalia] during their prior unlawful search[] of [the upstairs bedroom].  Thus, . . . [Wood's] consent to search was not an independent source of the evidence, but rather was an exploitation of the unlawful search[]."  Ealy, 12 Va. App. at 757, 407 S.E.2d at 689.

Further, the temporal proximity and the absence of any intervening circumstances between the illegal search and the consent fail to establish a break in the causal connection between the police misconduct and the subsequent consent.  The events occurred within hours after Wood was arrested.  No evidence in the record proved that any intervening circumstances occurred that tended to sever the connection between the events.

Because the officers' decision to seek Wood's consent was prompted by what they had seen during the initial unlawful search, Wood's consent was tainted by the unlawful search. Therefore, Wood's consent, even if voluntarily given, was not sufficiently attenuated from the warrantless search so as to "purge the taint" of that event.  See Walls, 2 Va. App. at 655, 347 S.E.2d at 185.

For these reasons, we reverse Wood's convictions and remand the case to the circuit court for further proceedings if the Commonwealth be so advised.

<u>Reversed and remanded</u>.

Willis, J., with whom Fitzpatrick, C.J., joins, concurring.

I understand the community caretaker doctrine to be as described in the dissent. Police officers are charged with the duty of promoting public safety and rendering needed assistance. This duty is separate from the detection of crime. The discharge of this duty may, under appropriate circumstances, justify warrantless entry into a residence. However, I do not find such circumstances to have existed in this case. Therefore, I concur in the result reached by the majority.

Annunziata, J., with whom Overton, J., joins, dissenting.

The threshold and dispositive issue in this case is whether the officers faced circumstances sufficient to justify their entry into and search of the second floor of appellant's home.[1] Appellant does not dispute that if the entry was lawful, the evidence to support his convictions was properly seized and admitted into evidence. The Commonwealth concedes that if the entry was unlawful, all the seized evidence was tainted and inadmissible to support appellant's convictions.

"The ultimate standard set forth in the Fourth Amendment is reasonableness." Cady v. Dombrowski, 413 U.S. 433, 439 (1973). Unreasonable searches and seizures are prohibited, but not those which are "reasonable in the circumstances." Verez v. Commonwealth, 230 Va. 405, 410, 337 S.E.2d 749, 752 (1985). Warrantless entries and warrantless searches are presumed to be unreasonable, and the Commonwealth bears the burden to prove their justification. E.g., id.; Commonwealth v. Ealy, 12 Va. App. 744, 751, 407 S.E.2d 681, 686 (1991).

In the present case, the trial court found the officers' entry of the second floor of appellant's home justified under the community caretaker doctrine. See Commonwealth v. Waters, 20 Va. App. 285, 456 S.E.2d 527 (1995); Barrett v. Commonwealth, 18 Va. App. 773, 447 S.E.2d 243 (1994) (en banc), rev'd on other

---

[1]There is no dispute that the officers' initial entry into appellant's home was lawful.

grounds, 250 Va. 243, 462 S.E.2d 109 (1995).[2]  Pointing to the

officers' knowledge of appellant's missing stepchild, the light

shining through the second floor window, the unusual smell

permeating the house, appellant's apparent beating of his wife,

and the fact that the officers were the last to leave appellant's

home, the Commonwealth argues that we should uphold the trial

court's ruling.  I agree.

> [Q]uite clearly police have occasion to enter
> premises without a warrant for a variety of
> . . . purposes.  The police have "complex and
> multiple tasks to perform in addition to
> identifying and apprehending persons
> committing serious criminal offenses"; by
> design or default, the police are also
> expected to "reduce the opportunities for the
> commission of some crimes through preventive
> patrol and other measures," "aid individuals
> who are in danger of physical harm," "assist
> those who cannot care for themselves,"
> "resolve conflict," "create and maintain a
> feeling of security in the community," and
> "provide other services on an emergency
> basis."

3 Wayne R. LaFave, Search and Seizure § 6.6 at 389-90 (1996).

The lawfulness of police action undertaken pursuant to such roles

is sometimes evaluated in terms of the "community caretaking

function," first discussed by the United States Supreme Court in

Cady v. Dombrowski, 413 U.S. 433 (1973).  Cady involved the

warrantless search of an automobile.[3]  First in Barrett and later

---

[2]In reversing Barrett, the Supreme Court held that the
evidence did not support a "reasonable suspicion" that Barrett
was in need of police assistance.  The Supreme Court did not rule
on this Court's adoption of the community caretaker doctrine.
250 Va. at 247-48, 462 S.E.2d at 112.

[3]The Court in Cady discussed well-established privacy

in <u>Waters</u>, this Court relied on <u>Cady</u> and adopted the community caretaker doctrine to justify warrantless, investigative "seizures" of people for purposes of aiding a citizen reasonably believed to be in distress.  This Court has also held that the community caretaker functions are not limited to automobile stops.  <u>Waters</u>, 20 Va. App. at 291, 456 S.E.2d at 530.

Under the facts of this case, I would affirm the trial court's application of the community caretaker doctrine to justify the warrantless entry into and investigative search of the second floor of appellant's home.  In so doing, I note that in the context of a warrantless entry and search, this Court has noted little, if any, distinction in Virginia law between the circumstances governing the application of the community caretaker doctrine and those governing the application of the

distinctions between automobiles and residences in affirming the reasonableness of the search in that case.  413 U.S. at 439-42. Such distinctions, however, have not precluded courts from evaluating warrantless entry and search of premises under the community caretaker function, <u>see</u> LaFave, <u>supra</u>, § 6.6 at 390 n.3.  While I recognize the distinction between the search of an automobile and the search of a home, certain factors relevant to the <u>Cady</u> analysis provide guidance here.  First, the <u>Cady</u> Court noted that the "police had exercised a form of custody or control over the [disabled automobile]" as a result of their investigating an automobile accident and the disabled driver's inability to make arrangements to have the automobile towed and stored.  413 U.S. at 442-43.  Second, the Court noted that the police had the car towed to a private garage where, to protect the public, the trunk was searched in accordance with police procedure to assure the removal of a revolver the police believed to be there.  <u>Id.</u> at 443.  Finally, the Court noted that in conducting the "search," the police were not motivated by a desire to find incriminating evidence of possible criminal behavior.  <u>Id.</u>

"emergency" exception to the warrant requirement.  Compare
Waters, 20 Va. App. at 288-91, 456 S.E.2d at 529-30, and Barrett,
18 Va. App. at 776-79, 447 S.E.2d at 245-46, with Reynolds v.
Commonwealth, 9 Va. App. 430, 436-37, 388 S.E.2d 659, 662-64
(1990), and Shannon v. Commonwealth, 18 Va. App. 31, 34-35, 441
S.E.2d 225, 226-27, aff'd on reh'g, 19 Va. App. 145, 449 S.E.2d
584 (1994).  This Court has defined the community caretaker
function of the police to be that duty which "extends beyond the
detection and prevention of crime, to embrace also an obligation
to maintain order and to render needed assistance."  Barrett, 18
Va. App. at 777, 447 S.E.2d at 245.  The community caretaker
doctrine, like the emergency exception to the warrant
requirement, is grounded in consideration of the fact that

> police [officers] owe "duties to the public,
> such as rendering aid to individuals in
> danger of physical harm, reducing the
> commission of crimes through patrol and other
> preventive measures, and providing services
> on an emergency basis."

Barrett, 18 Va. App. at 778, 447 S.E.2d at 246 (quoting Reynolds,
9 Va. App. at 436, 388 S.E.2d at 663 (citation omitted)); see
also Waters, 20 Va. App. at 289, 456 S.E.2d at 529; Shannon, 18
Va. App. at 34, 441 S.E.2d at 227.  "[T]he duty of the police
embraces the function of maintaining public order and providing
necessary assistance to persons in need or distress."  Barrett,

18 Va. App. at 778, 447 S.E.2d at 246.

Applying the community caretaker doctrine, I would find that the officers' entry into the second floor of appellant's home was lawful.

> The appropriateness of applying the community caretaker doctrine to a given factual scenario is determined by whether: (1) the officer's initial contact or investigation is reasonable; (2) the intrusion is limited; and (3) the officer is not investigating criminal conduct under the pretext of exercising his community caretaker function.

Waters, 20 Va. App. at 290, 456 S.E.2d at 530. An officer may take appropriate action under the community caretaker doctrine where the officer maintains a reasonable and articulable suspicion, based on objective facts, that such action is necessary. See Barrett, 18 Va. App. at 778, 447 S.E.2d at 246. "Objective reasonableness remains the linchpin of determining the validity of [such] action. . . ." Waters, 20 Va. App. at 290, 456 S.E.2d at 530. Cf. Reynolds, 9 Va. App. at 437, 388 S.E.2d at 663-64 (applying objective reasonableness test to emergency exception to warrant requirement).

Determination of whether the officers had reasonable suspicion to exercise their community caretaker function involves a mixed question of law and fact. The trial court's findings of historical fact will be upheld absent clear and manifest error. See Reynolds, 9 Va. App. at 437, 388 S.E.2d at 664. We review de novo the trial court's application of those facts to the legal standard of "reasonable suspicion." See Ornelas v. United

- 18 -

States, 116 S. Ct. 1657, 1662 (1996). That standard is determined from the perspective of the objectively reasonable police officer, and we give deference to the inferences the police officer draws from the historical facts with which he or she is faced. Id. at 1663; Murphy v. Commonwealth, 9 Va. App. 139, 144, 384 S.E.2d 125, 128 (1989) ("[W]hen a court reviews whether an officer had reasonable suspicion . . . it must view the totality of the circumstances and view those facts objectively through the eyes of a reasonable police officer with the knowledge, training, and experience of the investigating officer.").

In the present case, the officers had a reasonable basis to justify the exercise of their community caretaker function, which led them to enter the second floor of appellant's home. When the officers responded to appellant's house, they had reason to believe that appellant recently had beaten his wife and that appellant's stepson was missing. Upon their arrival, the officers noticed a light shining through a second floor window and determined that appellant was not on the second floor of the house when they arrived. One of the officers noticed a foul odor coming from somewhere in the house. Although neither officer heard any noise coming from the second floor, that alone would not preclude the presence of someone on that floor, and neither officer could be certain whether anyone else was in the house. The officers were assigned the duty to assure the safety and

welfare of appellant's two younger children asleep in the living room of the house, and they were the last to leave the premises. Before leaving, the officers investigated the remaining rooms of the house to make certain that appellant's missing stepson was not there and to avoid leaving anyone else behind and the house unsecured. The trial court's finding that the officers went upstairs to search for the defendant's missing child is a finding of historical fact supported by the evidence, and should not be disturbed. Reynolds v. Commonwealth, 9 Va. App. 430, 437, 388 S.E.2d 659, 663-64 (1990); see Shears v. Commonwealth, 23 Va. App. 394, 398, 477 S.E.2d 309, 311 (1996) (due weight is afforded "'a trial court's finding that [an] officer was credible and [that the officer's] inference was reasonable'").

I further disagree with the majority's conclusion that the evidence in this case proves that the search was not "totally divorced from" a criminal investigation. Indeed, all the evidence is to the contrary. Because the officers were guided by their concern for the child they believed to be missing, their investigation was limited to those places where they could reasonably expect to find a person; they did not open any cabinets or containers. Furthermore, in order to reach the conclusion that the search was instigated for the purpose of conducting a criminal investigation, the majority, a fortiori, has substituted its judgment for that of the trial court with respect to the weight of the evidence and the credibility of the

witnesses, in contravention of well-settled principles governing the standard of review.  See, e.g., Byers v. Commonwealth, 23 Va. App. 146, 152-53, 474 S.E.2d 852, 855 (1996) (citing Cable v. Commonwealth, 243 Va. 236, 239, 415 S.E.2d 218, 220 (1992)).

Finally, I note that while lawfully present on the second floor, the officers discovered certain items in plain view, the incriminating nature of which was immediately apparent to them. Accordingly, the plain view rule was met, and the items were subject to seizure and admissible in evidence.  See Reynolds, 9 Va. App. at 439, 388 S.E.2d at 665; Waters, 20 Va. App. at 291, 456 S.E.2d at 530.

Accordingly, I would affirm appellant's convictions.

Baker, J., concurring in dissent.

I concur with the dissenting opinion; however, I would caution that the community caretaker doctrine must be applied on a fact-specific basis.  In my opinion, this case meets the fact-specific requirement.