UNPUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

BRITT S. PHILLIPS,
           *Plaintiff-Appellant,*

v.

MICHAEL R. PEDDLE, in his
individual capacity,
           *Defendant-Appellee,*

and

BRIAN E. RUSSELL, in his individual
capacity,
           *Defendant,*

CARL BAKER; MARK A. YOUNCE,
           *Parties in Interest,*

N. EVERETTE CARMICHAEL,
Commissioner of Revenue for
Chesterfield County,
           *Movant.*

No. 00-1345

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
James R. Spencer, District Judge.
(CA-99-510)

Argued: December 5, 2000

Decided: March 16, 2001

Before WILKINS and NIEMEYER, Circuit Judges, and
Terrence W. BOYLE, Chief United States District Judge for the
Eastern District of North Carolina, sitting by designation.

Affirmed by unpublished opinion. Chief Judge Boyle wrote the opinion, in which Judge Wilkins and Judge Niemeyer joined.

---

## COUNSEL

**ARGUED:** Thomas Hunt Roberts, THOMAS H. ROBERTS & ASSOCIATES, P.C., Richmond, Virginia, for Appellant. Steven Latham Micas, County Attorney, Chesterfield, Virginia, for Appellee. **ON BRIEF:** Tim Schulte, THOMAS H. ROBERTS & ASSO-CIATES, P.C., Richmond, Virginia, for Appellant. Jeffrey Lee Mincks, Deputy County Attorney, Andrea West Wortzel, Assistant County Attorney, Chesterfield, Virginia, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

## OPINION

BOYLE, Chief District Judge:

Britt Phillips brought this action against Michael R. Peddle, *see* 42 U.S.C.A. § 1983 (West Supp 1998), alleging that Michael R. Peddle, a police officer with the Chesterfield County (VA) Police Department, violated Phillips' rights under the Fourth Amendment when Officer Peddle entered Phillips' home without a search warrant. Phillips sought damages and declaratory relief. The district court granted summary judgment in favor of the defendant, granting Officer Peddle qualified immunity, and dismissing the prayer for declaratory relief without comment. We affirm.

I.

In the spring of 1999 Phillips was interviewed by detectives with the Richmond Police Department as part of an ongoing criminal investi-

gation.[1] One of these investigators was Detective Brian E. Russell.[2] Subsequent to this interview, Detective Russell served Phillips with a subpoena to testify before a grand jury. Because the subpoena required an appearance on the following day, Phillips told Detective Russell that he could not make that appearance on such short notice but agreed to meet with some detectives at a later date to discuss the investigation again. After this, there was no more contact between Phillips and any of the police officers for over a month.

On July 9, 1999, Detective Russell went to Phillips' house to serve him with another subpoena ordering him to testify as a witness before a federal grand jury. Phillips did not know that Detective Russell was coming to his house that day. Detective Russell could not get Phillips to answer the door despite repeatedly knocking on the door and calling him on the telephone. Phillips designs webpages and said that he was in the back room of the house with a client and did not hear anyone. His shades were down on his windows because it was warm and in the middle of the summer. When Detective Russell could not get Phillips to respond, he radioed his dispatch. He said that he was told by the U.S. Attorney's Office to "do whatever you can to serve it." J.A. 163. Officer Peddle, the appellee, then was ordered to the scene to assist Detective Russell. Officer Peddle never heard the conversation between Detective Russell and the dispatch.

Officer Peddle arrived at the scene with another police officer and said that Detective Russell looked concerned and confused. Officer Peddle knew nothing about the relationship between Detective Russell and Phillips or the situation at Phillips' home before Peddle's arrival, but Detective Russell told Officer Peddle that he had been talking with Phillips earlier but now he could not get an answer. He also said that Phillips was a witness for the government, that he and Phillips had a good rapport, and that Phillips knew that Detective Russell was coming over to serve the subpoena. Detective Russell told Officer Peddle that he had repeatedly knocked on the door to the

---

[1]It is not clear from the record the exact nature of the investigation as some of the facts have been omitted, but nothing in the record indicates that Phillips was the target of the criminal investigation.

[2]At the time of this incident Detective Russell was also deputized as a Special Deputy United States Marshall.

house and yelled, "Police!" but was not getting any response. Detective Russell then pointed out that there was an additional car there that did not belong to Phillips and that Phillips had a bad back which might make it difficult for him to move. Although some of the facts that Detective Russell presented were untrue, this was the scene that Detective Russell presented to Officer Peddle.

Officer Peddle then went to a side window and tried to peer in but the blinds were closed. Detective Russell went to the front door and called out to Peddle, "The door is open." J.A. 47. Officer Peddle came around to the front and saw that the door was open 2 to 3 inches. Officer Peddle then went around to the back of the house and told the other officer that the front door was open and that he and Detective Russell were going into the house to check on Phillips. Officer Peddle then went back around to the front, pushed the door open further, and entered, shouting, "Police! We're coming in." J.A. 64. They then met Phillips in the hallway, and Phillips said that he had not come to the door because he was "with a client." J.A. 65. Officer Peddle then left the house after being inside for approximately 60 seconds. Detective Russell served the subpoena on Phillips and then left as well. Officer Peddle and the other officer then left the premises six minutes after they arrived.

Phillips brought this civil action against Officer Peddle, alleging violations of his rights under the Fourth Amendment. *See* 42 U.S.C.A. § 1983 (West Supp. 1998). Phillips sought monetary damages and declaratory and injunctive relief, barring Officer Peddle from entering his home without a warrant. The District Court granted Officer Peddle summary judgment, ruling that the suit was barred by qualified immunity.

An appeal from a decision to grant qualified immunity is reviewed de novo. *Pritchett v. Alford*, 973 F.2d 307 (4th Cir. 1992).

II.

Qualified immunity protects government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v.*

*Fitzgerald*, 457 U.S. 800, 818 (1982). This doctrine exists to protect officers in the performance of their duties unless they are "plainly incompetent" or they "knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 342 (1986). Qualified immunity protects law enforcement officers from "bad guesses in gray areas" and ensures that they are liable only "for transgressing brightlines." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992).

To evaluate qualified immunity claims, this Court has adopted a two step analysis: (1) Whether a clearly established right has been violated and (2) whether a reasonable person in the officer's position "would have known that the officer's conduct would violate that right." *Taylor v. Waters*, 81 F.3d 429, 433 (4th Cir. 1996) (quoting *Gordon v. Kidd*, 971 F.2d 1087, 1093 (4th Cir. 1992)). Because we hold that Officer Peddle did not violate a clearly established right, this Court need not address the second step of the above analysis.

It is a well settled "principle of Fourth Amendment law that searches . . . inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980). Here, the appellee argues that his entry into the house was justified under the "community caretaker" doctrine. The United States Supreme Court and this Court have both recognized that a police officer serving as a community caretaker to protect persons and property is constitutionally permitted to make searches and seizures without a warrant. See *Cady v. Dombroski*, 413 U.S. 433 (1973); *United States v. Newbourn*, 600 F.2d 452 (4th Cir. 1979). In *Cady*, the United States Supreme Court validated the warrantless entry and search of an automobile because the officers were engaged in a community caretaking function, and their actions were unrelated to "the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady*, 413 U.S. at 441.

Most cases involving the community caretaker doctrine have involved its application to the search of an automobile, and the courts have distinguished searches of and entries into automobiles from those of private residences. *See, e.g.*, *South Dakota v. Opperman*, 428 U.S. 364 (1976); *Colorado v. Bertine*, 479 U.S. 367 (1987). At least one other federal court of appeals has recognized that the "community caretaker" doctrine can apply in limited circumstances to justify a

warrantless entry in a home. *See United States v. Rohrig*, 98 F.3d 1506 (6th Cir. 1996). In *Rohrig*, the defendant moved to suppress evidence discovered during a warrantless entry into his home. The police entered the home in the middle of the night to turn down loud music that was disturbing neighbors, but only after repeated banging on the residents' door and calling them on the telephone. The Sixth Circuit upheld the search by referring to the community caretaking function that the United States Supreme Court has established. *See Cady*. One fact that the Sixth Circuit found to be important was that the police officers entered the residence for the limited purpose of locating and abating the nuisance and were not involved in a criminal investigation.

Virginia state courts have also adopted the "community caretaker" doctrine under certain circumstances.[3] In *Commonwealth v. Waters*, 20 Va.App. 285, 456 S.E.2d 527 (1995), the Virginia Court of Appeals acknowledged that, while most cases interpreting the "community caretaker" function concern police contact with motor vehicles, "[N]o language in *Barrett* or *Cady* restricts an officer's caretaking actions to incidents involving automobiles." *Waters* at 531 (citing *Barrett v. Commonwealth*, 18 Va.App. 773, 447 S.E.2d 243 (1994) (en banc), *rev'd on other grounds*, 250 Va. 243, 462 S.E.2d 109 (1995)).[4] *Barrett* recognized that the duty of the police extends beyond law enforcement and includes "an obligation to maintain order and render needed assistance." *Barrett* at 777, 447 S.E.2d at

---

[3]Because this is a question of federal constitutional law, we do not look to the Virginia courts for authority on this point. Instead, the Virginia courts also have a voice in the "clearly established" law under which Officer Peddle operated, and this Court has referred to Virginia state court decisions in the past when analyzing a claim for qualified immunity. *See, e.g.*, *Simmons v. Poe*, 47 F.3d 1370 (4th Cir. 1995) (relying on a Virginia Court of Appeals decision to grant qualified immunity to officers using a profile including race, among other factors, in a warrant application).

[4]The Virginia Supreme Court overturned the Virginia Court of Appeals, but in doing so the Virginia Supreme Court did not reject the community caretaker doctrine. Instead, the Virginia Supreme Court held that there was insufficient evidence to show that the subject who was stopped needed any police assistance. *See Barrett v. Commonwealth*, 250 Va. 243, 462 S.E.2d 109 (1995).

245. In *Wood v. Commonwealth*, 27 Va.App. 21, 497 S.E.2d 484 (1998), the Virginia Court of Appeals declined to apply the community caretaker exception to justify a warrantless intrusion into a private home, but noted,

> [T]he [United States] Supreme Court has yet to decide whether a situation might exist that would justify a warrantless intrusion into an individual's home under the "community caretaker" doctrine. . . . The Supreme Court has not decided that issue, and we need not decide it here because, on these facts, the officers' intrusion . . . could not be considered a caretaking function.

*Id*. at 27, 487 S.E.2d at 487. Thus, while refusing to apply the "community caretaker" doctrine to an intrusion into a private dwelling, the Virginia Court of Appeals left open the possibility that it could apply, particularly when the intrusion is "totally divorced from investigating criminal activity and acquiring evidence." *Id*.

When invoking qualified immunity, "[t]he law is clearly established such that an officer's conduct transgresses a bright line when the law has 'been authoritatively decided by the Supreme Court, the appropriate United States Court of Appeals, or the highest court of the state.'" *Wilson v. Layne*, 141 F.3d 111 (4th Cir. 1998). As noted above, neither the United States Supreme Court nor this Court have addressed the applicability of the community caretaker exception to a warrantless entrance of a private residence. Although numerous Virginia Court of Appeals cases have discussed the community caretaker doctrine, *Barrett* was the only case to address this doctrine in the Virginia Supreme Court. In *Wood*, another case involving a warrantless entry into a private home, the Virginia Court of Appeals did not dismiss the "community caretaker" doctrine outright as a matter of law, thus indicating that there is no clearly established law refuting the applicability of the community caretaker doctrine to an entry into a residence.

When determining if the officer's actions were reasonable for qualified immunity purposes, this Court must examine the information known by the officer at the time of the entry. *See Anderson v. Creighton*, 483 U.S. 635 (1987). When Officer Peddle arrived at the scene,

Detective Russell (a fellow law enforcement officer who was much more familiar with Phillips and the current situation) told Officer Peddle that Phillips was expecting the subpoena today. Based on the facts before this Court, Officer Peddle reasonably could believe that, at the time of the entry, the occupant needed assistance because he observed or was told: Phillips was a cooperating witness; Phillips and Detective Russell had a good rapport; Phillips was expecting Detective Russell and knew he was coming to serve the subpoena; Phillips and Detective Russell had been in contact; Phillips had not answered the door when Detective Russell yelled "Police!;" Phillips' car was in the driveway, and therefore he was probably home; all of the blinds to the house were closed; an unexplained car was in the driveway (sometimes federal witnesses are placed at risk because they are testifying against other criminals); and the front door was open 2 to 3 inches. Officer Peddle entered the house, saw that the Phillips was unharmed, and left, all within about 60 seconds. Officer Peddle was not involved in a criminal investigative matter and left immediately upon determining that Phillips was safe. These facts come together to present a scene in which an officer is operating as a community caretaker and not in an investigative capacity.

Because the United States Supreme Court has not spoken authoritatively on this issue, and the Virginia Supreme Court has never addressed this issue concerning a residential home, this Court concludes that Officer Peddle did not violate any clearly established law when he entered the home of Phillips. Officer Peddle was acting under the aegis of the community caretaker doctrine. Qualified immunity cloaks Officer Peddle from liability.

### III.

Finally we address the injunctive relief that Phillips sought. In his complaint, Phillips prayed that the district court enjoin the defendant from entering his home absent a warrant or exigent circumstances. The district court granted summary judgment against the plaintiff because the defendant was shielded by qualified immunity. Because the district court's decision rests on the applicability of the granting of qualified immunity to a prayer for injunctive relief, we review the decision *de novo. See Thornburgh v. American College of Obstetricians and Gynecologists*, 476 U.S. 747, 757 (1986) (stating that *de*

*novo* is the correct standard where the case "rests solely on a premise as the applicable rule of law").

The district court's denial of injunctive relief was proper. Phillips lacks standing to raise his claim for injunctive relief because he did not raise any facts to support the need for this relief, and the mere fact that he alleges that his rights were violated once does not establish any likelihood of a recurrence. *See Los Angeles v. Lyons*, 461 U.S. 95 (1983) ("That [appellee] may have been illegally choked by the police . . . does nothing to establish a real and immediate threat that he would again be stopped . . . by an officer or officers who would illegally choke him. . . ."). Phillips has failed to make any compelling reason for injunctive relief and does not suggest that this situation would occur again. Thus, this Court will deny Phillips' request for an injunction against Officer Peddle.

## IV.

For the foregoing reasons, we conclude that Officer Peddle was entitled to qualified immunity and there exists no basis to grant injunctive relief. We affirm the district court's granting of summary judgment for the appellee.

*AFFIRMED*