COURT OF APPEALS OF VIRGINIA

Present:   Chief Judge Fitzpatrick, Judges Benton, Elder, Frank, Humphreys, Clements,
           Felton, Kelsey and McClanahan
Argued at Richmond, Virginia

JOSHUA DAVIS KYER

                                                             OPINION BY
v.        Record No. 2200-03-2                     JUDGE D. ARTHUR KELSEY
                                                             MAY 3, 2005
COMMONWEALTH OF VIRGINIA

UPON REHEARING EN BANC

FROM THE CIRCUIT COURT OF CHESTERFIELD COUNTY
Michael C. Allen, Judge

James R. Cooke, Jr., for appellant.

John H. McLees, Senior Assistant Attorney General (Jerry W.
Kilgore, Attorney General, on brief), for appellee.

*Amicus Curiae*:  Virginia Association of Criminal Defense
Lawyers (Steven D. Benjamin; Betty Layne DesPortes, on brief),
for appellant.


        Joshua Davis Kyer challenges on appeal his burglary and larceny convictions, claiming

police unlawfully entered his mother's apartment where he lived and obtained incriminating

evidence in violation of the Fourth Amendment.  We agree with Kyer that no warrant exception

justified the police entry into the apartment.  But we also agree with the trial court that, once

inside, the police searched the apartment only after receiving permission from Kyer's mother to

do so.  This consent, the trial court correctly held, was "sufficiently an act of free will to purge

the primary taint."  Wong Sun v. United States, 371 U.S. 471, 486 (1963).

I.

        "On appeal from a denial of a suppression motion, we must review the evidence in the

light most favorable to the Commonwealth, giving it the benefit of any reasonable inferences."

Slayton v. Commonwealth, 41 Va. App. 101, 103, 582 S.E.2d 448, 449 (2003).

At about 2:00 a.m. on August 26, 2002, Officer B.E. Davis and Detective Brent Story responded to a burglar alarm at the Southside Speedway. They saw two suspects running from the scene. They caught one, but the other got away. With a tip from the detained suspect, the officers' investigation led them to the Kyer apartment.

The officers arrived at the apartment at approximately 4:00 a.m. The front door of the apartment was open wide enough for an individual to "walk through it without touching the door." There were no lights on. In this particular area, Detective Story observed, "it was not uncommon for this situation to occur." "Every time it does," he testified, "we make entry to make sure everything inside is okay." They knocked on the door several times, waited a couple of minutes, and then went inside with weapons drawn and flashlights on. Fearing someone had "forced entry or broken into the home," the officers conducted a two to three minute "cursory" protective sweep looking for any possible intruders.

After completing the protective sweep, Officer Davis awoke Kyer's mother, who was still asleep in her bedroom. Davis identified himself, inquired about her well-being, and asked if anyone else was "supposed to be in the house." She told him she lived there alone with her two sons. When asked if "she was okay," she replied "she was fine." During this conversation, Detective Story waited in the living room. Officer Davis left her bedroom to permit her to "get herself together." He went back into the living room and waited with Detective Story. Kyer's mother came out and then "excused herself to go back into her bedroom" before again reappearing to speak with the officers about ten minutes later. By this time, Kyer's brother had joined the officers in the living room after being awoken by them. No one else was in the apartment.

Detective Story sat down in a chair across from Kyer's mother and explained "what was going on and why [they] had been there originally and also explained to her why [they] came in

in the first place so she would understand that." She told the officers "everything was okay" and that she had been asleep. The officers also advised her about the Southside Speedway incident and the suggestion that her son may have been involved. She said she thought he was home all night and was still there.

After she had been briefed on the situation, Officer Davis then asked Kyer's mother for permission to search for "anything that was stolen from the Southside Speedway." She consented to the search. In the loft where Kyer normally slept, Officer Davis found several items stolen during the burglary of the Southside Speedway.

Kyer was charged with three counts of statutory burglary and three counts of petit larceny. Kyer moved to suppress the inculpatory evidence found in his bedroom, arguing that the officers' initial entry into the apartment was unlawful. That warrantless entry, Kyer argued, nullified the subsequent consent to search given by his mother. The trial court rejected both arguments.

The initial entry, the court held, fell within the "community caretaker doctrine and/or exigent circumstances" exception to the warrant requirement. The court found the officers' subjective intent in entering the apartment was motivated by their good faith desire to ensure an intruder had not come through the opened front door. Finding the officers' testimony credible, the court found they were not "acting under a pretext" to gain entry into the apartment to continue their investigation of the Southside Speedway burglary.

The trial court also held that, even if the initial entry fell outside the community caretaker or emergency exceptions, Kyer's mother voluntarily consented to the search and "the totality of the circumstances are not sufficient to have vitiated her consent." "So, on that ground, irrespective of what decision the Court might reach on the question of exigent circumstances or exercising community caretaker function, the consent was valid."

Following the trial court's ruling on the suppression motion, Kyer stipulated that the evidence was sufficient to prove his guilt on all charges. Upon being convicted, Kyer appealed to us challenging the trial court's denial of his suppression motion. A panel of our Court held the community caretaker doctrine authorized the initial entry into the apartment, thereby mooting any need to examine the legal efficacy of the later consent to search. Kyer v. Commonwealth, 43 Va. App. 603, 601 S.E.2d 6 (2004).

Having reconsidered the matter *en banc*, we hold the initial entry cannot be justified under the emergency or community caretaker doctrines and thus the consent issue must be decided. And, on that point, we agree with the trial court that the consent was not nullified by the earlier unlawful entry.

## II.

"Though the ultimate question whether the officers violated the Fourth Amendment triggers *de novo* scrutiny, we defer to the trial court's findings of 'historical fact' and give 'due weight to the inferences drawn from those facts by resident judges and local law enforcement officers.'" Slayton, 41 Va. App. at 105, 582 S.E.2d at 449 (quoting Barkley v. Commonwealth, 39 Va. App. 682, 689-90, 576 S.E.2d 234, 237-38 (2003)). Thus, we must give "deference to the factual findings of the trial court" and "independently determine" whether those findings satisfy the requirements of the Fourth Amendment. Whitfield v. Commonwealth, 265 Va. 358, 361, 576 S.E.2d 463, 464 (2003).

To prevail on appeal, "the defendant must show that the trial court's denial of his suppression motion, when the evidence is considered in the light most favorable to the prosecution, was reversible error." Id. In other words, on appeal, the "burden to establish that the denial of the motion to suppress constituted reversible error rests with the defendant." King v. Commonwealth, 39 Va. App. 306, 308, 572 S.E.2d 518, 519 (2002) (citation omitted).

## A. THE INITIAL ENTRY

Among the many interests served by the Fourth Amendment, the privacy interest in one's home has few equals. "At the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." Kyllo v. United States, 533 U.S. 27, 31 (2001) (citation and internal quotation marks omitted). "It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" Welsh v. Wisconsin, 466 U.S. 740, 748 (1984) (citation omitted). But even on this topic the Fourth Amendment's text endorses no absolutes. It instead condemns only "unreasonable" searches and seizures.

One concession to reasonableness, the emergency exception, recognizes the "right of the police to enter and investigate" when someone's health or physical safety is genuinely threatened. Reynolds v. Commonwealth, 9 Va. App. 430, 437, 388 S.E.2d 659, 664 (1990) (citation omitted); see also Mincey v. Arizona, 437 U.S. 385 (1978). It rests on the commonsense rationale that "preservation of human life is paramount to the right of privacy" protected by the Fourth Amendment. Reynolds, 9 Va. App. at 437, 388 S.E.2d at 664 (citation omitted). This concern parallels one of the applications of the community caretaker exception, which recognizes that "police owe 'duties to the public, such as rendering aid to individuals in danger of physical harm, reducing the commission of crimes through patrol and other preventive measures, and providing services on an emergency basis.'" Id. at 436, 388 S.E.2d at 663.[1]

---

[1] Under proper circumstances, both doctrines apply not only to the protection of human life or to avoid serious injury, but also to the protection of property interests. See, e.g., Michigan v. Tyler, 436 U.S. 499, 509 (1978) (concluding the need to protect property may justify a warrantless entry of premises); see also United States v. Johnson, 9 F.3d 506, 510 (6th Cir. 1993) (finding warrantless entry into house reasonable to "prevent the loss or destruction of the owner's property" where kitchen window was broken and neighbor reported burglary in progress); United States v. Dart, 747 F.2d 263, 267 (4th Cir. 1984) (upholding initial warrantless entry of warehouse where locks sawed off and doors forced open).

In this case, however, we need not engage in any extended analysis of the emergency or community caretaker exceptions. Nor need we elaborate on their various formulations. We believe the facts would not justify an objectively reasonable officer to think either exception applied.[2] Stripped of its immaterial aspects, the fact pattern in this case includes only one arguably suspicious circumstance: an open door on an August night.

There were no signs of forced entry — such as pry marks, mangled locks, broken hinges, or disfigured door jams.[3] No one called out for help. No sounds or observations suggested panic or danger within the apartment. There were no reports from neighbors about any unique medical concerns or other vulnerabilities of the apartment's occupants. Nor did any of Kyer's neighbors report any suspicious circumstances suggesting foul play. Cf. Hill v. Commonwealth, 18 Va. App. 1, 4, 441 S.E.2d 50, 51 (1994) (finding exigent circumstances existed when a neighbor reported that the homeowner "had been out of town for two days" prior to the police discovery of an open front door, leading the neighbor to fear "the house had been burglarized").

The mere discovery of an "open door" of a residence — absent some other reason for concern — "is not, *in and of itself*, a circumstance that could give rise to a reasonable belief that entry is necessary to prevent harm to persons or property." State v. Christenson, 45 P.3d 511, 513 (Or. Ct. App. 2002) (emphasis added). "It is simply too common an event to create a concern of harm in the absence of other signs of trouble, such as evidence of a forced entry or a

---

[2] We acknowledge, as the trial court found, that the officers did not act "under a pretext" and truly believed the circumstances justified a warrantless entry. As a general rule, however, an "officer's state of mind (except for the facts that he knows) is irrelevant" to the Fourth Amendment inquiry. Devenpeck v. Alford, 125 S. Ct. 588, 593 (2004); Slayton, 41 Va. App. at 109, 582 S.E.2d at 451.

[3] The Commonwealth also conceded at trial that, under the facts of this case, neither officer could reasonably assume Kyer returned home to commit "a crime in his own residence." As the prosecutor put it: "I don't think that's the assumption that they made. . . . I think

medical emergency; here, there were no such indications." Id.[4] In short, when the "only evidence of an emergency was a door left open late on a summer night," we agree with other courts that "regardless of what the officers may subjectively have thought, a reasonable person would not believe an emergency existed." State v. Swenson, 799 P.2d 1188, 1190 (Wash. Ct. App. 1990); see also State v. Ryon, 108 P.3d 1032, 1047 (N.M. 2005) (noting that, under the emergency assistance doctrine, an "open door ought not be viewed as a general invitation to enter"). The police had no legal right, therefore, to enter the Kyer apartment uninvited. The trial court erred in concluding otherwise.

## B.   THE CONSENT TO SEARCH

As a general rule, "a search authorized by consent is wholly valid." Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973). Consent loses its validity only if it is involuntary, Ohio v. Robinette, 519 U.S. 33, 40 (1996), or the product of a manipulative "exploitation" by the police of an earlier unconstitutional search or seizure. Wong Sun, 371 U.S. at 488; Warlick v. Commonwealth, 215 Va. 263, 266, 208 S.E.2d 746, 748 (1974).

Consent following an unconstitutional act, however, can still be valid if it is "sufficiently an act of free will to purge the primary taint." Brown v. Illinois, 422 U.S. 590, 597 (1975) (citing Wong Sun, 371 U.S. at 486). This attenuation principle should not be confused with a

---

certainly they're not looking at it as Mr. Kyer broke into his own residence, but that some other person or some other harm has befallen whoever is remaining inside."

[4] The tenuousness of the open door inference in Christenson disqualified it from satisfying a statutory "community caretaking" exception to the warrant requirement, Christenson, 45 P.3d at 512-14, as well as an analogous emergency exception recognized by the Oregon constitution, id. at 514-15. Even so, the Fourth Amendment relevance of Christenson (cf. *post* at 18-20) appears at the heart of its analysis: "We have held that an open front door does not justify entry into a house under the emergency aid doctrine or the community caretaking exceptions to the warrant requirement of the Fourth Amendment to the United States Constitution under more suspicious circumstances than those that existed here." Id. at 513 (citing State v. Bramson, 765 P.2d 824 (Or. Ct. App. 1988); State v. Apodaca, 735 P.2d 1264 (Or. Ct. App. 1987)).

mere "but for" standard of causation — which, if used for this purpose, would suppress evidence "simply because it would not have come to light but for the illegal actions of the police." Wong Sun, 371 U.S. at 488. Instead, "a finding with respect to attenuation . . . can only be made after consideration of all the circumstances of the case." United States v. Wellins, 654 F.2d 550, 554 (9th Cir. 1981). This necessarily requires a "careful sifting of the unique facts and circumstances of each case." Schneckloth, 412 U.S. at 233. There being no fixed formula, courts consider the amount of time between the illegal action and the acquisition of the evidence, the presence of intervening circumstances (like consent), and the purpose and flagrancy of the official misconduct. United States v. Seidman, 156 F.3d 542, 548 (4th Cir. 1998).

Consistent with these principles, voluntary consent — when sufficiently an act of free will to dissipate the taint — can provide an independent basis for admitting evidence despite an earlier unlawful entry by police. See, e.g., Seidman, 156 F.3d at 549 n.10 ("We see no reason why [consent] could not also sever the connection between an unlawful act and the acquisition of additional evidence. Indeed, voluntary consent is the quintessential act of free will."); United States v. Dickson, 64 F.3d 409, 410-11 (8th Cir. 1995) (holding that defendant's voluntary consent to search his apartment dissipated taint of prior illegal search); United States v. Valencia, 913 F.2d 378, 382 (7th Cir. 1990) ("Even assuming the initial entry was illegal, we agree with the district court that that entry did not taint Valencia's subsequent consent."); United States v. Sheppard, 901 F.2d 1230, 1234 (5th Cir. 1990) (holding that defendant's voluntary consent to search his car dissipated taint of officer's illegal entry); State v. Owen, 453 So. 2d 1202, 1207 (La. 1984) (holding that consent was valid despite "close temporal proximity between the illegal entry and Evans' consent" because Evans had "knowledge of the purpose of the entry and the

manner in which it was made" and thus the "official misconduct had an insignificant effect on the subsequent consent").[5]

On the other hand, the purgation of free will may not suffice in all cases of consent. It may be insufficient, for example, when the evidence has already been discovered before the consent during the prior illegal search. See, e.g., Wood v. Commonwealth, 27 Va. App. 21, 30-32, 497 S.E.2d 484, 488-89 (1998); Commonwealth v. Ealy, 12 Va. App. 744, 757-58, 407 S.E.2d 681, 689-90 (1991). It may be equally insufficient if given *after* the consenter has been illegally detained, Davis v. Commonwealth, 37 Va. App. 421, 433-35, 559 S.E.2d 374, 379-80 (2002), or *after* the police make an illegal entry for the "very purpose" of obtaining consent, Walls v. Commonwealth, 2 Va. App. 639, 655, 347 S.E.2d 175, 184 (1986). Absent such exploitive circumstances, however, a consensual encounter following an "illegal entry" can still be "sufficiently independent of the unlawful invasion to purge any taint arising from the initial entry." Seidman, 156 F.3d at 547.

In this case, Kyer does not contend on appeal that his mother's consent was involuntary. He argues only that, even if her "consent was voluntary," it still was not "sufficiently an act of free will to purge the primary taint" of the unlawful entry. We disagree. Before she consented to the search, Kyer's mother had been fully briefed by the police about "what was going on" and why they entered her apartment in the first place. The conversation took place in her living room, after she had about ten minutes to compose herself. At no time prior to the consent did the police recover any incriminating evidence. Nor did they in any way imply she was the subject of

---

[5] For similar reasons, a voluntary confession can be an act of free will sufficient to purge the taint of an earlier illegal arrest. See New York v. Harris, 495 U.S. 14, 21 (1990). Voluntary statements made after an unlawful roadblock likewise need not be suppressed. Burns v. Commonwealth, 261 Va. 307, 324 n.11, 541 S.E.2d 872, 884 n.11 (2001). So, too, an illegal entry into a home does not negate the lawfulness of the later search if it did not rely on

a criminal investigation. They did not detain her, place her in custody, threaten her with arrest, or restrict her freedom of movement in any way.

In these respects, our case parallels the situation addressed in <u>Valencia</u>, 913 F.2d at 382, where the United States Court of Appeals for the Seventh Circuit observed that the police

> did not exploit the initial entry. The police found no evidence as a result of that entry, and discovered no information that they used (or could use) to influence Valencia to consent to a search. Valencia points to the allegedly coercive effect of the officers' mere presence in his apartment. However, as we have seen, the district court found Valencia's consent to be free and voluntary. Implicit in this finding is the conclusion that the officers' presence did not coerce Valencia's consent. *Indeed, the district court explicitly found no evidence of any nexus between the initial entry and the consent.*

<u>Id.</u> (emphasis added). "Given all these factors," the Seventh Circuit held in <u>Valencia</u>, "we conclude that Valencia's consent was sufficiently independent of the allegedly illegal initial entry that the two events were 'so attenuated as to dissipate [any] taint' from the entry." <u>Id.</u> (quoting <u>Segura v. United States</u>, 468 U.S. 796, 805 (1984)).

We acknowledge that seeing two police officers, with weapons drawn, conduct a protective search of one's home would no doubt be an intimidating sight. But Kyer's mother saw none of that. She was asleep until awoken by Officer Davis. As the trial court found, this "was not a situation where they had guns drawn pointed at her head, asking her for consent." Nor is this a case where the officers entered for the "very purpose" of obtaining consent. <u>Walls</u>, 2 Va. App. at 655, 347 S.E.2d at 184. They entered because they believed the open door implied danger to those inside. Having weighed their credibility, the trial court found their explanation truthful and rejected the argument that the officers used this story as a mere pretext to gain entry into the house to investigate the Southside Speedway burglary. Bound by this factual finding,

_____

information obtained during the prior illegal entry. <u>Segura v. United States</u>, 468 U.S. 796, 815-16 (1984).

we see no reason to conclude the "purpose and flagrancy of the police misconduct," Wood, 27 Va. App. at 30, 497 S.E.2d at 488, should invalidate the voluntary consent to search given by Kyer's mother.

The main circumstance disfavoring this conclusion is the relatively short duration between the entry and consent. We think two observations answer that legitimate concern.

First, the specific length of time was all but irrelevant from the perspective of Kyer's mother. She was asleep when the police entered the apartment. She remained asleep as they conducted a protective search. When Officer Davis awoke her, she did not know whether the police had been there for a few minutes or a few hours. Her concededly voluntary consent did not depend in any way on the *duration* of the officers' presence in her apartment. That is, nothing about the situation suggests that Kyer's mother would have been more readily inclined to consent had she known the officers had been in her apartment *longer* than they in fact were. Cf. State v. Quinn, 623 P.2d 630, 638 (Or. 1981) (finding defendant's consent was unaffected by prior illegal search because, as defendant was unaware of the illegal search, his consent was "uninfluenced and untainted by the earlier unlawful act").

Second, as for the ten minutes or so between being awakened and providing consent, Kyer's mother took that time to compose herself and to listen to the officers explain why they came to her apartment and why they entered it uninvited. By itself, however, this brief duration does not put the attenuation inquiry to an end. It is just one of several considerations. Even a very short duration need not negate the efficacy of a voluntary consent. See, e.g., Seidman, 156 F.3d at 548 (finding a few minute period between entry and consent insufficient to negate consent); Sheppard, 901 F.2d at 1235 ("Even though the time span between the challenged conduct and Sheppard's consent was short, we cannot find that the second search resulted from

the exploitation of the challenged conduct."); <u>Owen</u>, 453 So. 2d at 1207 (holding that consent was valid despite "close temporal proximity" between the illegal entry and consent).

III.

In sum, we hold that the trial court erred in finding the initial police entry into the apartment could be justified under the emergency or community caretaker exceptions. We find no fault, however, with the court's alternative finding that the voluntary consent to search given by Kyer's mother was "sufficiently an act of free will to purge the primary taint." <u>Wong Sun</u>, 371 U.S. at 486. The trial court, therefore, correctly denied Kyer's motion to suppress.

<u>Affirmed.</u>

Humphreys, J., concurring in the result.

I agree that the trial court correctly denied Kyer's motion to suppress. However, I continue to believe that the officers' initial entry into the Kyer residence was proper under the community caretaker exception to the warrant requirement. And, because the warrantless entry was reasonable, the officers properly searched the residence after obtaining the voluntary consent of Kyer's mother. Thus, although I would affirm the judgment of the trial court, I concur only in the result reached by the majority.

I.

The officers arrived at Kyer's home at approximately 4:00 in the morning. At that time, the front door was open "wide enough for [Officer Davis] to walk through it without touching the door." It was dark and raining. There were no exterior lights on, and no lights were on inside the home. Because of these circumstances, Officer Davis and Detective Story believed that "[s]omeone had forced entry or broken into the home." Accordingly, the officers "made a . . . plan," discussing how they would respond if they "encounter[ed] any opposition." The officers then "knocked on the door several times," announcing their presence. There was no response. After waiting for "a couple" of minutes, the officers drew their firearms and flashlights and proceeded inside the home and up the stairs, "continuing to announce [their] presence" in "loud voice[s]."

Based on these facts, the trial court explicitly found that "it was appropriate for the officers to enter the residence," reasoning that "the community caretaker doctrine and/or exigent circumstances permitted their entry into the residence." In particular, the court found that the officers' "initial contact or investigation was objectively reasonable," also concluding that the "police officers in this case were [not] acting under a pretext."

- 13 -

II.

As recognized by the majority, "[i]t is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'"  Welsh v. Wisconsin, 466 U.S. 740, 748 (1984) (quoting United States v. United States District Court, 407 U.S. 297, 313 (1972)).  Nevertheless, the Fourth Amendment protects people only from "unreasonable" searches and seizures.  See Elkins v. United States, 364 U.S. 206, 222 (1960); Verez v. Commonwealth, 230 Va. 405, 410, 337 S.E.2d 749, 752 (1985).  For that reason, the United States Supreme Court has carved out a few delineated exceptions to the warrant requirement.  United States District Court, 407 U.S. at 318.

For example, according to the "emergency doctrine," a warrantless entry into a private residence is valid if there is a "reasonably perceived 'emergency' requiring immediate entry as an incident to the service and protective functions of the police as opposed to, or as a complement to, their law enforcement functions."  United States v. Moss, 963 F.2d 673, 678 (4th Cir. 1992); see also Mincey v. Arizona, 437 U.S. 385 (1978); Reynolds v. Commonwealth, 9 Va. App. 430, 436-37, 388 S.E.2d 659, 663-64 (1990).  That is, because

> [t]he right of the police to enter and investigate in an emergency is inherent in the very nature of their duties as police officers[,] [a] warrantless search during an emergency situation is "justified, if not required, by the fact that 'the preservation of human life is paramount to the right of privacy protected by search and seizure laws and constitutional guaranties [sic].'"

Reynolds, 9 Va. App. at 437, 388 S.E.2d at 664 (quoting State v. Fisher, 686 P.2d 750, 761 (Ariz. 1984)) (other citations omitted).[6]

---

[6] Although the "emergency doctrine" is often equated to the "exigent circumstances" exception to the warrant requirement, the two differ slightly.  When officers conduct an emergency entry for purposes of investigating a crime, the emergency is considered an "exigency" for purposes of the exigent circumstances exception, and the officers must have probable cause before they can enter the residence.  See Commonwealth v. Thornton, 24 Va. App. 478, 484, 483 S.E.2d 487, 490 (1997) (recognizing that, "[a]mong the circumstances

- 14 -

Similarly, the "community caretaker doctrine" authorizes a warrantless search conducted pursuant to an officer's "community caretaking functions," as long as the search is "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." Cady v. Dombroski, 413 U.S. 433, 436-37, 441 (1973) (affirming the warrantless search of the trunk of a car that had been towed to a garage pursuant to the "standard procedure" of a local police department). Although this Court has yet to apply the community caretaker exception to validate the warrantless search of a home, little distinction has been made between the circumstances governing the application of the community caretaker doctrine and those governing the application of the emergency exception to the warrant requirement, which unquestionably authorizes a warrantless entry into a private residence. Compare Commonwealth v. Waters, 20 Va. App. 285, 288-91, 456 S.E.2d 527, 529-30 (1996), and Barrett v. Commonwealth, 18 Va. App. 773, 776-79, 447 S.E.2d 243, 245-46 (1994), rev'd on other grounds, 250 Va. 243, 462 S.E.2d 109 (1995), with Reynolds, 9 Va. App. at 436-37, 388 S.E.2d at 663-64, and Shannon v. Commonwealth, 18 Va. App. 31, 34-35, 441 S.E.2d 225, 226-27, aff'd on reh'g en banc, 19 Va. App. 145, 449 S.E.2d 584 (1994).[7] Indeed, the non-exigent form

---

accepted as providing 'exigent circumstances' for a warrantless search, are those where a true 'emergency' exists"). If, however, the officers effectuate an emergency entry for a purpose *unrelated* to the investigation of a crime—for example, to provide emergency aid to an injured resident—then the entry is valid as long as the officers had an objectively reasonable belief that their help was needed. In this latter sense, the emergency exception is functionally equivalent to, and sometimes deemed a subset of, the community caretaker doctrine.

[7] As this Court recognized in Wood v. Commonwealth, 27 Va. App. 21, 28, 497 S.E.2d 484, 487 (1998), the United States Supreme Court has yet to decide whether a warrantless intrusion into an individual's *home* may be supported pursuant to the community caretaker exception. Nevertheless, we have applied the exception to uphold warrantless searches in the context of a search of an automobile. See Williams v. Commonwealth, 42 Va. App. 723, 731, 594 S.E.2d 305, 309 (2004); Barrett, 18 Va. App. at 778, 447 S.E.2d at 246. We have also extended this doctrine to permit warrantless searches of pedestrians or citizens that an officer reasonably believes are in distress or in need of assistance. See Terry v. Commonwealth, 23 Va. App. 87, 91, 474 S.E.2d 172, 174 (1996); Waters, 20 Va. App. at 289-90, 456 S.E.2d at 529-30.

of the emergency exception, also called the "emergency aid doctrine," is often deemed a subset of the community caretaker doctrine.[8]

Nevertheless, the community caretaker doctrine, like the emergency exception, is premised on the concept that police officers owe "'duties to the public, such as rendering aid to individuals in danger of physical harm, reducing the commission of crimes through patrol and other preventive measures, and providing services on an emergency basis.'" Barrett, 18 Va. App. at 778, 447 S.E.2d at 246 (quoting Reynolds, 9 Va. App. at 436, 388 S.E.2d at 663 (citation omitted)); see also Wood v. Commonwealth, 27 Va. App. 21, 33, 497 S.E.2d 484, 490 (1998) (Annunziata, J., dissenting). Indeed, it is far from illogical to expect that police officers, as a necessary function of their profession, do much more than simply "investigate" crimes or wrongs that have already occurred or that have unfolded in their presence. To the contrary,

> [p]olice have "complex and multiple tasks to perform in addition to identifying and apprehending persons committing serious criminal offenses;" by design or default, the police are also expected to "reduce the opportunities for the commission of some crimes through preventive patrol and other measures," "aid individuals who are in danger of physical harm," "assist those who cannot care for themselves," "resolve conflict," "create and maintain a feeling of security in the community," and "provide other services on an emergency basis."

3 W. LaFave, Search and Seizure § 6.6, at 389-90 (1996); see also Wood, 27 Va. App. at 33, 497 S.E.2d at 490 (Annunziata, J., dissenting). Thus, "police [often] have occasion to enter premises without a warrant for a variety of . . . purposes," including fulfillment of their community caretaking duties. Wood, 27 Va. App. at 33, 497 S.E.2d at 490 (Annunziata, J., dissenting) (internal quotations omitted).

Accordingly, I would hold that the community caretaker exception, in its narrowest sense, must logically extend to the warrantless entry of homes, as long as the officer conducting

---

[8] See note 1, supra.

the search is acting appropriately within the doctrine and independent of his criminal investigatory duties.[9]

## III.

The majority does not seriously contest the applicability of the community caretaker exception to a private residence, concluding instead that, under the circumstances of this case, "the facts would not justify an objectively reasonable officer to think [the] exception applied." The majority reasons that, considering the lack of signs of forced entry and the absence of cries for help, the entry was objectively unreasonable. I disagree.

### A.

The appropriateness of applying the community caretaker doctrine to a given factual scenario is determined by whether, based upon the totality of the circumstances, it was reasonable for the officer to believe that his or her actions were necessary for: (1) the protection of the owner's property while it remains in police custody; (2) the protection of police against claims or disputes concerning lost or stolen property; or (3) protection of the public and the police from physical danger. Williams v. Commonwealth, 42 Va. App. 723, 730, 594 S.E.2d 305, 309 (2004) (citing Reese v. Commonwealth, 220 Va. 1035, 1039, 265 S.E.2d 746, 749

---

[9] We have consistently required that any warrantless search, pursuant to either the community caretaker exception or the emergency exception, must be factually unrelated to an intent to search for evidence of illegal activity. See Reynolds, 9 Va. App. at 438, 388 S.E.2d at 664 (applying the emergency exception and noting that "[n]o evidence in the record suggest[ed] that the [officers'] entry into appellants' house . . . was a pretext to search for contraband or illegal activity rather than to look for possible victims and to secure the property," and finding that the officers "act[ed] in good faith under the circumstances and according to their responsibilities as law enforcement officers"); see also Williams, 42 Va. App. at 731, 594 S.E.2d at 309 (noting that a search, pursuant to impoundment of a vehicle and corresponding community caretaking functions, "must not be a pretextual surrogate for an improper investigatory motive"); Waters, 20 Va. App. at 290, 456 S.E.2d at 530 (applying the community caretaker exception in the context of a police/pedestrian encounter and stating that "[t]he appropriateness of applying the community caretaker doctrine to a given factual scenario is determined by," among other things, "whether . . . the officer is not investigating criminal conduct under the pretext of exercising his community caretaker function").

(1980); <u>South Dakota v. Opperman</u>, 428 U.S. 364, 373-76 (1976); <u>Cady</u>, 413 U.S. at 442-48). Specific factors to be considered include: (1) whether the officer's initial contact or investigation is reasonable; (2) whether the intrusion is limited; and (3) whether the officer is investigating criminal conduct under the pretext of exercising his community caretaker duties. <u>Waters</u>, 20 Va. App. at 290, 456 S.E.2d at 530. Overall, "[o]bjective reasonableness remains the linchpin of determining the validity of [the] action." <u>Id.</u>; <u>cf.</u> <u>Reynolds</u>, 9 Va. App. at 437, 388 S.E.2d at 663-64 (applying objective reasonableness test to emergency exception to warrant requirement).

Under the circumstances of this case, I would hold that the officers' warrantless entry into the home was justified pursuant to the community caretaker exception. The officers arrived at Kyer's home at 4:00 a.m. It was dark and raining outside. No lights were on inside or outside the home. Yet, the front door to Kyer's home stood open—wide enough that the officers could walk through it without touching the door. The officers announced their presence loudly, several times, and, after receiving no answer, they entered the home to determine whether anyone was in the home and whether those persons were in need of assistance. The officers made a limited "protective sweep," motivated only by the safety and well-being of the residents. Moreover, as expressly found by the trial court, the officers did not enter the home under the pretext of searching for evidence of criminal activity.

Considering the totality of these circumstances, I would hold that the officers, acting out of "concern for the safety of the general public," <u>Cady</u>, 413 U.S. at 447, reasonably believed that "there [might be] a difficulty requiring [their] general assistance." <u>Laney v. State</u>, 117 S.W.3d 854, 861 (Tex. Ct. Crim. App. 2003) (internal quotations omitted). Thus, I would affirm the trial court's determination that the officers' limited entry was objectively reasonable and, as a result, constitutionally permissible pursuant to the community caretaker exception to the warrant requirement. Indeed, because the officers reasonably believed that "foul play" might have

occurred, I am of the opinion that the officers "would have been derelict in their duty" had they *not* entered the residence. State v. Hetzko, 283 So. 2d 49, 52 (Fla. Dist. Ct. App. 1973).

B.

The majority, however, citing State v. Christenson, 45 P.3d 511 (Or. Ct. App. 2002), concludes that "an open door on a summer morning is not, *in and of itself*, a circumstance that could give rise to a reasonable belief that entry is necessary to prevent harm to persons or property." Id. at 513 (emphasis added). Because Christenson is distinguishable from the present case in several key respects, I do not believe that its holding is persuasive under the circumstances of this case.

First, in Christenson, the investigating officers encountered an open door at 9:20 a.m., on a "summer morning." Here, it was 4:00 a.m., dark, and raining. There is a significant difference between encountering an open door at 9:20 a.m. and encountering an open door at 4:00 a.m. That is, although it would not be particularly unusual to leave the front door ajar at 9:20 on a "summer morning," it is markedly more suspicious to encounter an open door at 4:00 a.m., when it is still dark outside, it is raining, and the residents of the home are much more likely to be asleep.

Second, in Christenson, the issue before the court was not whether the officers' conduct violated the warrant requirement of the Fourth Amendment to the United States Constitution. Rather, the Christenson court was interpreting a provision of the Oregon "community caretaker" statute, Or. Rev. Stat. § 133.033, which, *inter alia*, gives "officers of [that] state" the permission to enter "the premises of another" so as to "[p]revent serious harm to any person or property." Or. Rev. Stat. § 133.033(2)(a)(A). Although the court noted that the "community caretaking function is subject to the limitations on warrantless searches contained in Article I, section 9, of the Oregon Constitution," 45 P.3d at 513, the Christenson court did not rule that the officers'

- 19 -

conduct, in addition to exceeding the scope of their statutory authority, also violated the Fourth Amendment to the United States Constitution. Rather, the court held only that the officers' conduct could not be validated under the state constitution, reasoning that "*[t]here is no community caretaking exception under the Oregon Constitution.*" Id. at 514 (emphasis added).

Third, in Christenson, the lower court *granted* the defendant's motion to suppress, holding that "the officers had no basis in fact for having [the belief that someone inside the house was injured] other than that the door was open and the dogs were running around." Id. at 513. The appellate court acknowledged that it was "bound by . . . [this] finding[] of historical fact." Id. Here, in contrast, the trial court found that the initial investigation was "objectively reasonable," and *denied* the motion to suppress. We have held that "[t]he reasonableness of a police officer's response in a given situation is a question of fact for the trial court[,] and its ruling will not be disturbed on appeal absent clear and manifest error." Reynolds, 9 Va. App. at 437, 388 S.E.2d at 664; see also Shears v. Commonwealth, 23 Va. App. 394, 398, 477 S.E.2d 309, 311 (1996) (noting that this Court gives due weight to "a trial court's finding that [an] officer was credible and [that the officer's] inference was reasonable" (internal quotations omitted)). Accordingly, we, too, are "bound by . . . [this] finding[] of historical fact," Christenson, 45 P.3d at 513, specifically, that the warrantless entry was objectively reasonable.

Thus, I believe the significant disparities between the circumstances of the present case and those presented in Christenson render that case unsuitable to justify the majority's legal position.

C.

Moreover, the majority's underlying rationale—that the officers needed some "additional fact" to justify a warrantless entry under the circumstances of this case—demonstrates confusion or a decided lack of understanding of the community caretaker exception to the warrant

requirement. Citing <u>Hill v. Commonwealth</u>, 18 Va. App. 1, 441 S.E.2d 50 (1994), a case in which a panel of this Court authorized a warrantless entry premised on the *exigent circumstances* exception to the warrant requirement, the majority concludes that "something more" was needed here.

In <u>Hill</u>, the police department received a call from a neighbor, requesting that the police "send somebody out to check to see whether [Hill's] house had been broken into." <u>Id.</u> at 2, 441 S.E.2d at 50. The neighbor informed the police that Hill was out of town, that he had not been seen for two days, and that the front door to the house was open. <u>See id.</u> The officers went to the house to investigate. Upon their arrival, they noted that the front door "was open about twelve to fifteen inches," and they rang the doorbell and knocked on the door. <u>Id.</u> After receiving no response, the officers "entered the home *to investigate the possibility of a burglary*." <u>Id.</u> (emphasis added). While searching the home "in places where a burglar might hide," the officers discovered marijuana and various drug paraphernalia. <u>Id.</u> at 2-3, 441 S.E.2d at 50-51.

On appeal, we held that the trial court properly denied Hill's motion to suppress, reasoning that the exigent circumstances exception to the warrant requirement applied. <u>See id.</u> at 3, 441 S.E.2d at 51. We noted that, "*[w]hen probable cause exists*, exigent circumstances excuse the requirement of obtaining a warrant," and concluded that, under the circumstances of that case, the officers had "*probable cause* to believe that Hill's house had been unlawfully entered." <u>Id.</u> at 4, 441 S.E.2d at 51 (emphasis added).

The exigent circumstances exception to the warrant requirement applies when, *inter alia*, "there is a clear showing of probable case at the time of entry," and "the officers have strong reason to believe the suspects are present in the premises," or that evidence will be destroyed absent an immediate entry. <u>Id.</u> at 3, 441 S.E.2d at 51 (citing <u>Verez</u>, 230 Va. 405, 337 S.E.2d 749). Thus, this exception is properly applied where, as in <u>Hill</u>, there is probable cause to

believe that a crime has been or is being committed, and the officers enter the premises *for the purpose of investigating that crime*. See id.

The community caretaker exception, however, does not require a showing of probable cause. Rather, it requires an *objectively reasonable belief* that the officers' conduct is necessary to provide aid or to protect members of the public from physical harm. See Williams, 42 Va. App. at 730, 594 S.E.2d at 309; Waters, 20 Va. App. at 290, 456 S.E.2d at 530. Moreover, unlike the exigent circumstances exception, the warrantless entry must be "totally divorced" from a criminal investigation. Cady, 413 U.S. at 436-37. That is, the police officers must be acting in a protective, rather than crime-fighting, capacity.

Because the warrantless entry must be "totally divorced" from a criminal investigation, proof that a crime has been or is being committed adds nothing to a community caretaker analysis. But here, by opining that some "additional fact" would have justified the officers' warrantless entry, the majority, in essence, seems to be requiring a showing of probable cause as a prerequisite for application of the community caretaker doctrine. That is, the majority implies that, in order to have an objectively reasonable belief that an individual is in need of assistance, the officers must also have probable cause to believe that a crime has been or is being committed. In practical effect, then, the majority is subsuming the community caretaker doctrine into the exigent circumstances exception. I simply cannot join in this result. See generally Laney, 117 S.W.3d at 860-61 (discussing the distinction between the community caretaker doctrine and the exigent circumstances exception); Mary Elisabeth Naumann, Note, "The Community Caretaking Doctrine: Yet Another Fourth Amendment Exception," 26 Am. J. Crim. L. 325, 332 (1999) ("[T]he reasoning behind the community caretaker doctrine precludes an equation . . . [with the] exigent circumstances [exception] because the latter necessarily involves criminal considerations.").

IV.

For these reasons, I would hold that the officers' warrantless entry was justified pursuant to the community caretaker exception to the warrant requirement. Had these officers' worst fears been justified and had hindsight disclosed a resident either deceased or in desperate need of medical assistance, I doubt that either the resident, assuming he or she survived, or the general public would accept the majority's reasoning that it would not be "objectively reasonable" for police to investigate such suspicious circumstances. Thus, although I agree that the trial court did not err in denying Kyer's motion to suppress, I disagree with the analysis of the majority and, consequently, concur only in the result.

Fitzpatrick, C.J., with whom Benton, and Elder, JJ., join, concurring, in part, and dissenting, in part.

I concur in the majority's ruling that the community caretaker exemption to the Fourth Amendment warrant requirement did not justify the police entry into appellant's apartment. However, I respectfully dissent from that portion of the majority opinion that holds that appellant's mother's later consent to search was "sufficiently an act of free will" to purge the originally illegality. See Wong Sun v. United States, 371 U.S. 471, 486 (1963). Thus, I would reverse the convictions.

Having determined that the initial entry into Kyer's home was made in violation of the Fourth Amendment and that Kyer's mother gave consent to the police to search the home, it is necessary to analyze whether this consent was obtained as the result of the illegal entry. I believe that the facts of this case glaringly fail to establish that the consent given by Kyer's mother was sufficiently attenuated from the earlier unlawful police entry to provide an independent basis for admitting the seized contraband.

> The exclusionary rule prohibits the introduction into evidence of tangible and testimonial evidence acquired during an unlawful search, while also prohibiting the introduction of derivative evidence "that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes 'so attenuated as too dissipate the taint.'" The exclusionary rule's prohibition of derivative evidence is the essence of the "fruit of the poisonous tree" doctrine.

Commonwealth v. Ealy, 12 Va. App. 744, 754, 407 S.E.2d 681, 687-88 (1991) (citations omitted).

The remaining question to be resolved is whether the later acquired evidence is tainted and was "come at by exploitation of the initial illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Segura v. United States, 468 U.S. 796, 804-05 (1984). As stated by the Supreme Court in Brown v. Illinois, 422 U.S. 590 (1975), the fact that

the consent ultimately given may have been voluntary, does not mean that the primary taint has been purged. Id. at 599. Factors that must be considered include the temporal proximity of the illegal entry, whether Kyer's mother was informed that she could withhold her consent, any additional intervening circumstances between the entry and the consent, and the purpose and flagrancy of the official misconduct. Id. at 603-04. See also Davis v. Commonwealth, 37 Va. App. 421, 433-35, 559 S.E.2d 374, 379-80 (2002); Walls v. Commonwealth, 2 Va. App. 639, 654, 347 S.E.2d 175, 183 (1986).

In the instant case, the facts establish that the police entered Kyer's home at 4:00 a.m. after failing to awaken the sleeping occupants. They went into Ms. Kyer's bedroom with their flashlights shining and their guns drawn. They identified themselves as police and after allowing her time to "get herself together," but within ten minutes of the original contact, began to question her about her son's possible involvement in the theft they were investigating when they first came to her home. At that point she consented to the search. Ten minutes is hardly a reasonable period of time in which to recover from the police entry into a private home with guns drawn. Thus, there was no significant passage of time and the temporal intervention requirement was unmet. See Taylor v. Alabama, 457 U.S. 687, 691 (1982) (six hours between illegal arrest and confession); Brown, 422 U.S. at 604 (two hours between arrest and confession).

Next, Ms. Kyer was never informed that she could refuse to consent to the police search. There were no other intervening circumstances between the police entry and their questioning of Ms. Kyer which led to her consent. The only Brown factor favorable to the Commonwealth's position is that the trial court found that the initial entry was not pretextural. While I agree with the majority that no single factor controls and a "careful sifting of the unique facts and circumstances of each case" is required, the facts of this case do not establish the requisite break in the causal connection between the illegal entry and the later consent to search. This evidence

was "'come at by exploitation of that illegality . . . instead of by means sufficiently distinguishable to be purged of the primary taint.'" <u>Wong Sun</u>, 371 U.S. at 488 (citation omitted). Thus I would reverse the convictions.

Tuesday                    21st

September, 2004.


Joshua Davis Kyer,                                                      Appellant,

 against          Record No. 2200-03-2
                  Circuit Court Nos. CJ03F00020-01 through CJ03F00020-03
                   and CJ03M00021-01 through CJ03M00021-03

Commonwealth of Virginia,                                              Appellee.


Upon a Petition for Rehearing En Banc

Before Chief Judge Fitzpatrick, Judges Benton, Elder, Annunziata, Bumgardner,
Frank, Humphreys, Clements, Felton, Kelsey and McClanahan


On August 31, 2004 came Joshia Davis Kyer, the appellant, by court-appointed counsel, and

filed a petition praying that the Court set aside the judgment rendered herein on August 17, 2004, and

grant a rehearing *en banc* thereof.

On consideration whereof, the petition for rehearing *en banc* is granted, the mandate entered

herein on August 17, 2004 is stayed pending the decision of the Court *en banc*, and the appeal is

reinstated on the docket of this Court.

The parties shall file briefs in compliance with Rule 5A:35. The appellant shall attach as an

addendum to the opening brief upon rehearing *en banc* a copy of the opinion previously rendered by the

Court in this matter.  It is further ordered that the appellant shall file with the clerk of this Court twelve

additional copies of the appendix previously filed in this case.

A Copy,

Teste:

Cynthia L. McCoy, Clerk

By:

Deputy Clerk

COURT OF APPEALS OF VIRGINIA

Present:   Judges Bumgardner, Humphreys and Senior Judge Hodges
Argued at Richmond, Virginia


JOSHUA DAVIS KYER

                                                                OPINION BY
v.        Record No. 2200-03-2              JUDGE ROBERT J. HUMPHREYS
                                                              AUGUST 17, 2004
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF CHESTERFIELD COUNTY
Michael C. Allen, Judge

        James R. Cooke, Jr., for appellant.

        John H. McLees, Senior Assistant Attorney General (Jerry W.
        Kilgore, Attorney General, on brief), for appellee.


        Joshua Davis Kyer appeals his convictions, after a bench trial, for three counts of

statutory burglary, in violation of Code § 18.2-91 and three counts of petit larceny, in violation

of Code § 18.2-96.  Kyer argues the trial court erred in refusing to suppress certain evidence,

which he alleges was "obtained as a result of an illegal, warrantless search and seizure."  For the

reasons that follow, we affirm.

I.  Background

        As the parties conceded below, the facts in this case are essentially "uncontroverted."  On

August 26, 2002, Officer B.E. Davis and Detective Brent Story, of the Chesterfield County

Police Department, responded to an "ACTF" alarm that had been activated at Southside

Speedway.  It was approximately 2:00 a.m.  Officer Davis was in uniform; Detective Story was

wearing "a shirt and tie."  As they arrived on the scene, they observed two individuals running

from the establishment.[1]  The officers were able to apprehend only one of the individuals.  That individual subsequently implicated a "Mr. Able" in the burglary.[2]  The officers immediately went to Mr. Able's home and questioned him.  Mr. Able implicated Kyer in the burglary and agreed to take the officers to Kyer's home.

The officers arrived at Kyer's home at approximately 4:00 a.m. that morning.  As they approached the front door, they observed that the door was open "wide enough for [Officer Davis] to walk through it without touching the door."  It was dark and raining, and "[t]here were no exterior lights" on, nor lights on inside the home.

Because of the circumstances, Officer Davis and Detective Story believed that "[s]omeone had forced entry or broken into the home."  Accordingly, they "made a . . . plan," discussing how they would respond if they "encounter[ed] any opposition."  The officers then "knocked on the door several times," announcing their presence.  After "a couple" of minutes, and after hearing no response from inside the home, the officers drew their firearms and flashlights and proceeded inside the home and up the stairs, "continuing to announce [their] presence" in "loud voice[s]."

While conducting a "protect[ive] sweep" of all of the rooms of the home, Officer Davis found that two people were in the home, "asleep in their beds."  "Less than two minutes" later, while Detective Story waited in the "living room" of the home, Officer Davis awoke one of the

---

[1]  Upon investigating the alarm, officers found that "six or so" doors had been "forcibly entered" and "several items" had been taken.  This same location had been burglarized on two other occasions, within the past 60 days.

[2]  According to the record, "Mr. Able" was a third individual who was involved in the burglary.  Police had observed "Mr. Able" near the scene.  However, "Mr. Able" was in a car and, although the officers suspected he had been involved in the burglary, they did not have sufficient information "to hold him" at that time.

sleeping individuals by shining his flashlight "on her." The officers later learned that individual was Kyer's mother. When she awoke, Officer Davis identified himself, inquired as to her well-being, and asked if anyone else was "supposed to be in the house." Kyer's mother responded that "her sons were." The officers then woke up Kyer's brother, the only other person they had observed sleeping in the home.

After Kyer's mother "g[ot] herself together," approximately ten minutes after Officer Davis woke her up, Officer Davis and Detective Story met with her and Kyer's brother in the "common area" of the home. Detective Story "sat down in a chair across from her, explained . . . what was going on and why [they] had been there originally and also explained to her why [they] came in in the first place so she would understand that." Officer Davis then asked Kyer's mother if they could "check[] the house for anything that was stolen from the Southside Speedway." Kyer's mother agreed. Officer Davis subsequently found several of the missing items in Kyer's bedroom.

Kyer was charged with three counts of statutory burglary and three counts of petit larceny. Because Kyer was a minor, he was tried and convicted of the charges in the juvenile and domestic relations district court. Kyer appealed his convictions to the circuit court and prior to his trial *de novo*, filed a motion to suppress the evidence against him, arguing the officers' search was "conducted without a warrant and was not within any exception to the warrant requirement."

During the hearing on Kyer's motion to suppress, Detective Story testified that he had "worked the midnight shift for over nine years in patrol" and that it was not "uncommon" to approach homes and find doors standing open. He stated, "[e]very time [this occurs], we make entry to make sure everything inside is okay."

Kyer's counsel subsequently argued that the officers did not enter the home because of an "exigent circumstance," but agreed that if the officers were exercising their "community caretaker function" in entering the home, their entry would be a "justifiable exception[] to the prohibition against a warrantless search." Nevertheless, Kyer's counsel contended that the evidence demonstrated they entered the home, not for purposes of exercising their community caretaker function, but for the pretextual purpose of investigating Kyer's "criminal activity." Kyer's counsel argued further:

> The other issue, Your Honor, that I think is important to consider is that, you know, this is a residence. This isn't a car. This isn't some sort of thing where we have a lesser expectation of privacy. This is someone's home. I heard the officer testify that they have a practice of entering homes. However, I mean, in my experience, I've not known police to enter homes just simply because a door is ajar.
>
>      *    *    *    *    *    *    *
>
> The only remaining issue, Your Honor, would be whether or not any consent obtained thereafter would be acceptable or valid[.] . . . I think another issue here, Judge, is whether or not under those circumstances a person can give a voluntary, uncoerced kind of consent.

The trial court ruled as follows, in relevant part:

> I find that . . . it was appropriate for the officers to enter the residence, although they certainly arrived there initially as part of the conduct of the criminal investigation, I do think that the community caretaker doctrine and/or exigent circumstances permitted their entry into the residence. Particularly, I find that their initial contact or investigation was objectively reasonable, but the intrusion was limited and I do not find that the police officers in this case were acting under a pretext. . . . I also find that even in the absence of evidence that [Kyer's mother] was expressly advised that she had the right to withhold consent, the totality of the circumstances are not sufficient to have vitiated her consent. So, on that ground, irrespective of what decision the Court might reach on the question of exigent circumstances or exercising community caretaker function [sic], the consent was valid. Therefore, I'm going to overrule the motion to suppress . . . .

Kyer subsequently pled "Not Guilty" to the charges, but conceded that the evidence summarized by the Commonwealth would be sufficient to support convictions. After noting that Kyer "preserve[d] [his] objection on the 4th Amendment issue," the trial court found Kyer guilty of the charged offenses.

## II. Analysis

On appeal, Kyer argues that the trial court erred in denying his motion to suppress because: 1) the "community caretaker exception," as applied in the Commonwealth, does not extend to homes; 2) even were the "community caretaker exception" to apply, the officers lacked a "reasonable basis" upon which to believe that entry into the home was warranted; and 3) Kyer's mother's consent was "vitiated as a result of the illegal, warrantless entry." For the reasons that follow, we disagree.

We note first, that "[t]he burden to establish that the denial of the motion to suppress constituted reversible error rests with the defendant." King v. Commonwealth, 39 Va. App. 306, 308, 572 S.E.2d 518, 519 (2002) (citations omitted).

> At a hearing on a defendant's motion to suppress evidence allegedly obtained in violation of the Fourth Amendment, the defendant has the burden of establishing standing by proving that he had a reasonable expectation of privacy in the place searched, and the Commonwealth has the burden of proving that the relevant searches or seizures did not violate the defendant's Fourth Amendment rights.

Jefferson v. Commonwealth, 27 Va. App. 1, 10, 497 S.E.2d 474, 478 (1998) (citations omitted). Further, "[w]e are bound by the trial court's findings of historical fact unless 'plainly wrong' or without evidence to support them[,] and we give due weight to the inferences drawn from those facts by resident judges and local law enforcement officers." McGee v. Commonwealth, 25 Va. App. 193, 198, 487 S.E.2d 259, 261 (1997) (*en banc*) (citing Ornelas v. United States, 517 U.S. 690, 699 (1996)). "However, we review *de novo* the trial court's application of defined

- 5 -

legal standards such as probable cause and reasonable suspicion to the particular facts of the case."  Hayes v. Commonwealth, 29 Va. App. 647, 652, 514 S.E.2d 357, 359 (1999).

> It is axiomatic that the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." United States v. United States District Court, 407 U.S. 297, 313 (1972).  And a principal protection against unnecessary intrusions into private dwellings is the warrant requirement imposed by the Fourth Amendment on agents of the government who seek to enter the home for purposes of search or arrest.  See Johnson v. United States, 333 U.S. 10, 13-14 (1948).  It is not surprising, therefore, that the [United States Supreme] Court has recognized, as "a 'basic principle of Fourth Amendment law[,]' that searches and seizures inside a home without a warrant are presumptively unreasonable." [Payton v. New York, 445 U.S. 573, 586 (1980)].

Welsh v. Wisconsin, 466 U.S. 740, 748-49 (1984).  Nevertheless, the Fourth Amendment protects people only from "unreasonable" searches and seizures.  See Elkins v. United States, 364 U.S. 206, 222 (1960); Verez v. Commonwealth, 230 Va. 405, 410, 337 S.E.2d 749, 752 (1985).  For that reason, the United States Supreme Court has carved out a few delineated exceptions to the warrant requirement.  United States District Court, 407 U.S. at 318.

One such exception, recognized by the United States Supreme Court and adopted by the courts of this Commonwealth, is known as the "emergency doctrine."  See Reynolds v. Commonwealth, 9 Va. App. 430, 436-37, 388 S.E.2d 659, 663-64 (1990); see also Mincey v. Arizona, 437 U.S. 385 (1978).  This exception is described as a "reasonably perceived 'emergency' requiring immediate entry as an incident to the service and protective functions of the police as opposed to, *or as a complement to, their law enforcement functions*."  United States v. Moss, 963 F.2d 673, 678 (4th Cir. 1992) (emphasis added).  Thus, because

> [t]he right of the police to enter and investigate in an emergency is inherent in the very nature of their duties as police officers[,] [a] warrantless search during an emergency situation is "justified, if not required, by the fact that 'the preservation of human life is paramount to the right of privacy protected by search and seizure laws and constitutional guaranties [sic].'"

- 6 -

<u>Reynolds</u>, 9 Va. App. at 437, 388 S.E.2d at 664 (quoting <u>State v. Fisher</u>, 686 P.2d 750, 761 (Ariz. 1984)) (other citations omitted) (applying emergency doctrine as type of exigent circumstance *permitting entry of residence* in course of investigating burglary and confirming safety of residents where police had already apprehended burglar who admitted prior entry into residence and noting "[a]mong the circumstances accepted as providing 'exigent circumstances' for a warrantless search are those where a true 'emergency' exists").

Another exception to the warrant requirement is very similar to the emergency doctrine. That exception has become known as the "community caretaker doctrine." <u>Cady v. Dombroski</u>, 413 U.S. 433 (1973). In <u>Cady</u>, the United States Supreme Court upheld a warrantless search of a trunk of a car that had been towed to a garage after an accident. 413 U.S. at 436-37. The Court noted that towing the car to the garage was "standard procedure" in that particular police department. <u>Id.</u> In affirming the reasonableness of the search, the Court recognized that:

> Because of the extensive regulation of motor vehicles and traffic, and also because of the frequency with which a vehicle can become disabled or involved in an accident on public highways, the extent of police-citizen contact involving automobiles will be substantially greater than police-citizen contact in a home or office. Some such contacts will occur because the officer may believe the operator has violated a criminal statute, but many more will not be of that nature. Local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, *may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute*.

<u>Id.</u> at 441 (emphasis added).

As this Court recognized in <u>Wood v. Commonwealth</u>, 27 Va. App. 21, 28, 497 S.E.2d 484, 487 (1998), the United States Supreme Court has yet to decide whether a warrantless intrusion into an individual's *home* may be supported by the community caretaker exception.

Indeed, as Kyer accurately argues on appeal, we have likewise yet to decide if the community caretaker doctrine may apply to validate a warrantless entry into a home.[3]  Nevertheless, we have applied the exception to uphold warrantless searches in the context of a search of an automobile. See Williams v. Commonwealth, 42 Va. App. 723, 731, 594 S.E.2d 305, 309 (2004); Barrett v. Commonwealth, 18 Va. App. 773, 778, 447 S.E.2d 243, 246 (1994), reversed on other grounds, 250 Va. 243, 462 S.E.2d 109 (1995).  We have also extended this doctrine to permit warrantless searches of pedestrians or citizens that an officer reasonably believes are in distress or in need of assistance.  See Terry v. Commonwealth, 23 Va. App. 87, 91, 474 S.E.2d 172, 174 (1996); Commonwealth v. Waters, 20 Va. App. 285, 289-90, 456 S.E.2d 527, 529-30 (1995).

We find it of no moment, however, that we have yet to apply the community caretaker exception in the context of a warrantless search of a home.  Indeed, we find that in the context of a warrantless entry and search, little distinction has been made between the circumstances governing the application of the community caretaker doctrine and those governing the application of the emergency exception to the warrant requirement.  Compare Waters, 20 Va. App. at 288-91, 456 S.E.2d at 529-30, and Barrett, 18 Va. App. at 776-79, 447 S.E.2d at 245-46, with Reynolds, 9 Va. App. at 436-37, 388 S.E.2d at 663-64, and Shannon v.

---

[3]  The Commonwealth contends on appeal that Kyer failed to raise this particular argument below and thus, that we are barred from considering this issue pursuant to Rule 5A:18. However, as set forth above, Kyer clearly argued – albeit somewhat inartfully:

> The other issue, Your Honor, that I think is important to consider is that, you know, this is a residence.  This isn't a car.  This isn't some sort of thing where we have a lesser expectation of privacy. This is someone's home.

We thus find that Kyer properly preserved the issue for purposes of appeal.  See Lash v. County of Henrico, 14 Va. App. 926, 929, 421 S.E.2d 851, 853 (1992) (en banc) (noting that Rule 5A:18, "does not prohibit reliance on statutes or cases not presented to the trial court to support, on appeal, a position otherwise adequately presented at trial").

Commonwealth, 18 Va. App. 31, 34-35, 441 S.E.2d 225, 226-27, aff'd on reh'g, 19 Va. App. 145, 449 S.E.2d 584 (1994).

In fact, the only true distinction between these two doctrines is whether the search at issue related to a criminal investigation.  In particular, as noted in Moss, the emergency doctrine may apply independent of investigatory functions, *or* it may apply as a "complement to [such] functions."  Moss, 963 F.2d at 678.  When applied as a "complement" to investigatory functions of the police, the emergency exception becomes subsumed within the doctrine of exigencies and must therefore, satisfy the requirements of warrantless entry under those circumstances.  See Commonwealth v. Thornton, 24 Va. App. 478, 484, 483 S.E.2d 487, 490 (1997) (recognizing that "[a]mong the circumstances accepted as providing 'exigent circumstances' for a warrantless search are those where a true 'emergency' exists" (quoting Reynolds, 9 Va. App. at 436, 388 S.E.2d at 663)); see also Hill v. Commonwealth, 18 Va. App. 1, 3, 441 S.E.2d 50, 51 (1994) ("When probable cause exists, exigent circumstances excuse the requirement of obtaining a warrant, *but exigent circumstances do not excuse the requirement of probable cause*." (emphasis added)).

However, when applied independently of police investigatory functions (in the "non-exigent" context), the emergency exception becomes the functional equivalent of that portion of the community caretaker doctrine recognizing that, independent from their duties of investigating crimes, "police owe 'duties to the public, such as rendering aid to individuals in danger of physical harm, reducing the commission of crimes through patrol and other preventive measures, and providing services on an emergency basis.'"  Reynolds, 9 Va. App. at 436, 388 S.E.2d at 663 (quoting Washington v. Bakke, 723 P.2d 534, 536 (Wash. Ct. App. 1986)). Nevertheless, unlike the hybrid nature of the emergency exception, the community caretaker exception may *only* apply to those circumstances "totally divorced from the detection,

investigation, or acquisition of evidence relating to the violation of a criminal statute." Cady, 413 U.S. at 441.[4]

For that reason, this Court has consistently required that any warrantless search, pursuant to either the community caretaker exception or the "non-exigent" form of the emergency exception, be factually unrelated to an intent to search for evidence of illegal activity. See Reynolds, 9 Va. App. at 438, 388 S.E.2d at 664 (applying the emergency exception and noting that "[n]o evidence in the record suggest[ed] that the [officers'] entry into appellants' house . . . was a pretext to search for contraband or illegal activity rather than to look for possible victims and to secure the property," and finding that the officers "act[ed] in good faith under the circumstances and according to their responsibilities as law enforcement officers"); compare Williams, 42 Va. App. at 731, 594 S.E.2d at 309 (noting that a search, pursuant to impoundment of a vehicle and corresponding community caretaking functions, "must not be a pretextual surrogate for an improper investigatory motive"); King, 39 Va. App. at 310, 572 S.E.2d at 520; Servis v. Commonwealth, 6 Va. App. 507, 521, 371 S.E.2d 156, 163 (1988); compare also Waters, 20 Va. App. at 290, 456 S.E.2d at 530 (applying the community caretaker exception in the context of a police/pedestrian encounter and stating that "[t]he appropriateness of applying the community caretaker doctrine to a given factual scenario is determined by," among other things, "whether . . . the officer is not investigating criminal conduct under the pretext of exercising his community caretaker function").

Accordingly, we find that any distinction between the two exceptions has been effectively eradicated in the Commonwealth. In fact, such eradication has erred on the side of the sanctity of individuals' Fourth Amendment privacy rights, by requiring, in every case, that

---

[4] The trial court implicitly recognized the similarity between these two doctrines in its ruling, "I do think that the community caretaker doctrine and/or exigent circumstances permitted their entry into the residence."

police officers conducting warrantless searches pursuant to these exceptions do so independently of their criminal investigatory functions. In light of this, we find no reason to conclude that both doctrines, community caretaker and emergency, *given the appropriate circumstances*, should not extend to warrantless searches of homes.

As indicated above, an understanding of the policy issues concerned further supports our conclusion. The community caretaker doctrine, similar to the emergency exception to the warrant requirement, is grounded in consideration of the fact that police officers owe "duties to the public, such as rendering aid to individuals in danger of physical harm, reducing the commission of crimes through patrol and other preventive measures, and providing services on an emergency basis." Barrett, 18 Va. App. at 778, 447 S.E.2d at 246 (quoting Reynolds, 9 Va. App. at 436, 388 S.E.2d at 663 (citation omitted)); see also Wood, 27 Va. App. at 33, 497 S.E.2d at 490 (Annunziata, J., dissenting). Indeed, it is far from illogical to expect that police officers, as a necessary function of their profession, do much more than simply "investigate" crimes or wrongs that have already occurred or that have unfolded in their presence. To the contrary,

> [p]olice have "complex and multiple tasks to perform in addition to identifying and apprehending persons committing serious criminal offenses;" by design or default, the police are also expected to "reduce the opportunities for the commission of some crimes through preventive patrol and other measures," "aid individuals who are in danger of physical harm," "assist those who cannot care for themselves," "resolve conflict," "create and maintain a feeling of security in the community," and "provide other services on an emergency basis."

3 W. LaFave, Search and Seizure § 6.6, at 389-90 (1996); see also Wood, 27 Va. App. at 33, 497 S.E.2d at 490 (Annunziata, J., dissenting). Thus, "police [often] have occasion to enter premises without a warrant for a variety of . . . purposes." Id.

- 11 -

While we recognize that the factual circumstances supporting an application of the community caretaking function "used to uphold a *vehicle* search, such as existed in Cady, may not be sufficient to justify an intrusion into an individual's *home*," Wood, 27 Va. App. at 27, 497 S.E.2d at 487 (citing Cady, 413 U.S. at 439; and South Dakota v. Opperman, 428 U.S. 364, 367 (1976)) (noting the distinction in the privacy interests of a vehicle versus a residence) (emphases added), it is fundamental that police will have occasion to enter many types of "premises" for the purpose of carrying out their community caretaking duties and that such other premises will necessarily include homes. In fact, under circumstances leading an officer to reasonably believe that an individual inside a home was in immediate need of his or her assistance, the officer would clearly be remiss if he or she refused to investigate the matter and/or offer that assistance, based solely on the fact that the individual was located within a home, versus a car or a public sidewalk. For these reasons, we hold that at least some form of the community caretaker exception, *in its narrowest sense*, must logically extend to the warrantless entry of homes.

Our analysis, however, is not yet complete. We must now determine whether the circumstances presented in the case at bar were sufficient to warrant application of the community caretaker exception. The appropriateness of applying the community caretaker doctrine to a given factual scenario is determined by whether, based upon the totality of the circumstances, it was reasonable for the officer to believe that his or her actions were *necessary* for: "1) the protection of the owner's property while it remains in police custody, 2) the protection of police against claims or disputes concerning lost or stolen property, [or] 3) protection of the public and the police from physical danger." Williams, 42 Va. App. at 730, 594 S.E.2d at 309 (citing Reese v. Commonwealth, 220 Va. 1035, 1039, 265 S.E.2d 746, 749 (1980); Opperman, 428 U.S. at 373-76; and Cady, 413 U.S. at 442-48); see also Reynolds, 9 Va. App. at 437, 388 S.E.2d at 664 ("Police officers are not required to possess either the gift of prophecy or

the infallible wisdom that comes with hindsight. Their conduct in making a warrantless search must be judged by the circumstances confronting the officers at the time they act."). Specifically, factors to be considered are whether (1) the officer's initial contact or investigation is reasonable; (2) the intrusion is limited; and (3) the officer is not investigating criminal conduct under the pretext of exercising his community caretaker function. Waters, 20 Va. App. at 290, 456 S.E.2d at 530.

In the case at bar, evidence supported the trial court's implicit finding that each of these factors was satisfied. It is clear that Officer Davis and Detective Story were in the process of investigating a burglary when they arrived at Kyer's home. However, given the circumstances presented at the time the officers approached Kyer's front door, the officers' warrantless entry into the home was justified pursuant to the community caretaker exception. In particular, the burglary that the officers were investigating had occurred only a few hours before they arrived at Kyer's home. The officers arrived there at 4:00 a.m., a time when conditions were dark and rainy. Yet, the front door to Kyer's home stood open – wide enough so that the officers could walk through it without touching the door. No lights were on in the home, and no sounds were heard by the officers. As Detective Story testified, the officers announced their presence loudly, several times, and after receiving no answer they entered the home for the limited purpose of determining whether anyone was in the home and whether those persons were in need of assistance. We find no error in the trial court's determination that these officers, under the totality of the circumstances presented at the time, reasonably believed that persons in the home might be in need of immediate assistance and that their limited entry was necessary.

Further, the evidence in the record supports the trial court's factual determination that the officers' reason for entering the home was not pretextual and was unrelated to their initial purpose of investigating the burglary. Indeed, upon entering the home, the officers limited their

search for persons inside the home who might be in need of assistance. Once they determined that no person was in need of assistance, they gathered in the living room with Kyer's mother and brother to explain the purpose for their presence. The officers did not proceed to search the home. In fact, it was only after the officers explained their presence to Kyer's mother that they *requested to search* the home for the stolen items. And, it was only after Kyer's mother granted her consent that the officers proceeded to search the home for the items at issue. See Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973) ("[A] search authorized by consent is wholly valid.").

Considering the totality of these circumstances - most importantly, the trial court's factual finding that the actions of the officers here were not pretextual - we find that the officers' warrantless entry into the residence was constitutionally permissible pursuant to the community caretaker exception to the warrant requirement. Because we have found the officers' initial entry into the home was lawful pursuant to the community caretaker exception, we need not address Kyer's alternative argument that his mother's consent was "vitiated as a result of the illegal, warrantless entry."[5] We, likewise, need not address the Commonwealth's contention, made

---

[5] Kyer's Statement of The Questions Presented frames this issue as whether the "trial court err[ed] in ruling that, even if the warrantless entry/search of the Appellant's residence was excepted under the community caretaking doctrine, the subsequent consent to search given by Appellant's mother was valid." In keeping with this argument, Kyer contended below, "I think another issue here, Judge, is whether or not under those circumstances a person can give a voluntary, uncoerced kind of consent." Nevertheless, in his brief on appeal, Kyer argued only that Kyer's mother's consent was invalid as a result of the initial "illegal" entry by the police officers. Kyer did not argue that the officers' entry into the home, regardless of its legality, necessarily affected the voluntary nature of his mother's consent. Thus, given that Kyer now argues on appeal only that the consent was the "fruit of the poisonous tree" of the "illegal" entry, and having found that the entry was proper under the community caretaker doctrine, we need not address the issue of the validity of the consent further.

during oral argument, that the trial court actually intended to base its holding on the "emergency doctrine," but mistakenly stated "community caretaker and/or exigent circumstances."

For the above-stated reasons, we affirm the judgment of the circuit court.

<u>Affirmed.</u>